[No. C061065. Third Dist. Jan. 24, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
KYLE JORDAN VIGIL et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts III., IV. and V. of the Discussion.

## COUNSEL

A. M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant Kyle Jordan Vigil.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant Joshua Lawrence Latham.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Jesse Witt, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BUTZ, J.**—This case involves one of the most egregious types of juror misconduct. During deliberations, a juror performed an experiment at his home under conditions not subject to judicial oversight or cross-examination. He later reported the result, which was unfavorable to defendant, to his fellow jurors, who were struggling over a crucial issue in the case. The jury subsequently convicted defendant Kyle Jordan Vigil of shooting at an occupied dwelling (Pen. Code, § 246),[1] with a true finding that the crime was committed to benefit a criminal street gang (§ 186.22, subd. (b)(1) (hereafter section 186.22(b)(1))), an enhancement that earned him an indeterminate life sentence (§ 186.22, subd. (b)(4)).

Vigil was the driver of the car that was used to commit the charged crimes. The shooter, codefendant Joshua Lawrence Latham, was convicted by the same jury of the same offense and enhancement, as well as an additional count of discharging a firearm in a grossly negligent manner (§ 246.3) for the benefit of a criminal street gang (§ 186.22(b)(1)).

Both defendants appeal. With respect to Vigil, we shall reverse the judgment for prejudicial jury misconduct. With respect to Latham, we find no reversible error and shall affirm.

## FACTUAL BACKGROUND

### The Shootings

In the late night hours of June 21, 2007, gunshots were fired at two separate residences in Woodland. A witness who lived at 1309 Donnelly Circle saw a white car pass by and heard slurs against the Sureño street gang, followed by gunshots. Subsequently, a bullet was found lodged in a rooftop air-conditioner of the witness's apartment building and 13 .30-caliber shell casings were discovered nearby.

Gunshots were also fired at a house located at 1656 Santoni Lane, where a reputed Sureño gang member resided. Officers discovered seven bullet holes in the walls of the residence. Spray-painted graffiti denigrating a Sureño gang "subset" was discovered in front of the house.

### Victor Chaney's Testimony

Victor Chaney was the star witness for the prosecution. Chaney testified that he was a longtime friend of defendants Latham and Vigil, having grown up with them in the same apartment complex in Woodland.

---

[1] Undesignated statutory references are to the Penal Code.

Chaney testified that he and Vigil attended a party at Latham's house on the night in question. After two or three hours of socializing and drinking alcohol Chaney, Latham, Vigil and someone known only as "Chase" went upstairs to Latham's room. Once in the room, the individuals in the group continued to drink alcohol and smoked marijuana. Chaney was "buzzing" from the alcohol. He believed each person drank about the same amount.

At one point, Chaney noticed a rifle inside Latham's closet. Latham took the gun out, brandished it and bragged that he had used it "unlawfully." Chaney took photos of Latham posing with the rifle and "showing it off." Latham made a comment to the effect that he was "ready for war."

Chaney, Latham, Vigil and Chase then walked out of the apartment building together, with Latham carrying the rifle over his shoulder. The group headed towards Latham's car, which was parked outside. When they got to the car, Latham threw Vigil the car keys.

The foursome got into the car. Vigil was the driver, while Latham occupied the passenger seat. Chaney and Chase sat in the back. Before they departed, Latham announced that anyone who was "scared to go to prison" should get out of the car. No one moved.

The group went to the Yolano neighborhood, where Vigil drove into a parking lot. After Vigil stopped the car, Latham got out and discharged five or six rounds from the rifle. Latham appeared to be pointing the gun toward the houses or duplexes, but at an angle "like up in the sky." When he was finished, Latham got back in the car and they drove toward the Bel Air neighborhood. At this point, Chaney caught a glimpse of Vigil's face in the rearview mirror. Vigil "looked remorseful."

When they arrived in the Bel Air neighborhood, Vigil drove by a certain house and Latham opened fire out of the open passenger window. On this occasion, Latham was shooting "at the house." At the time of the shooting, the car was traveling about five to 10 miles per hour. Chaney put his head down after the first shot, because he knew "we were . . . doing a drive-by." Following the second shooting, Vigil drove back to their apartment complex. Latham put the rifle in the trunk and the group went back to Latham's apartment and smoked some marijuana. About 30 to 35 minutes later, the four went back to the car and were prepared to go out again, when they were stopped by Chaney's father.

There is no indication in the record that Chaney was charged with any crime or that he was offered any special treatment in exchange for his testimony. Chaney stated that he came clean to the police solely because he found out his dad was dying of cancer and he wanted to "be there for him." He denied that anyone intimidated or threatened him, or tried to prevent him from testifying.

Chaney denied that there was any discussion that evening about gangs, a specific objective or a destination during the entire adventure. He did not know how or why the house in the Bel Air district was targeted, although he was aware that the Yolano neighborhood was a reputed gang area occupied by "Southerners."

*Gang Evidence*

Detective Ronald Cordova of the Woodland Police Department testified as an expert in criminal street gangs, with special emphasis on Nuestra Familia and the Norteño gang. Cordova had previously been qualified as an expert on both Norteño and Sureño gangs, having spoken to more than 300 Norteño and 100 Sureño gang members, and written at least 25 gang-related search warrants.

Detective Cordova testified that the Norteño and Sureño gangs have been around since the 1960's and are natural rivals. In Woodland, as elsewhere, these gangs have divided up territory, with the Norteños occupying the north and Sureños the south part of the region. The Norteños are a validated street gang.

Gang members show their affiliation by colors, letters, numbers, tattoos and music. They also have monikers and use hand signs and graffiti on their personal belongings. There are about 350 validated Norteño gang members in the Woodland area. There are also "associates" who hang around gang members and "veteranos," who are inactive themselves, but mentor younger gang members.

Gang members use fear and intimidation to generate respect from rival gangs and within the community. In the Norteño culture, no act of disrespect can go unanswered. The primary activities of the Norteños include assaults with deadly weapons, drug dealing, burglaries, and driveby shootings. Detective Cordova described the factual settings in which Woodland Norteño gang members were convicted of felonies with gang enhancements.

Detective Cordova recounted that several items seized at Vigil's apartment included gang paraphernalia, writings, pictures, and graffiti. In Cordova's opinion, these items were indicative of Vigil's association with the Norteño street gang. In addition, a scrolled "kite" found in Vigil's possession while in jail contained information that indicated he had been in contact with a member of Nuestra Familia, which is the governing body of the Norteños.

Detective Cordova also opined that Latham was a validated member of the Norteño gang. Images seized from Latham's computer were indicative of gang affiliation and three rap CD's (compact discs) found in Latham's residence were further indicia of gang membership. Officers also found a red baseball cap in Latham's residence with an "N" logo, which is a symbol of the Norteños.

It was Detective Cordova's opinion that the shootings at Donnelly Circle and Santoni Lane were both committed for the benefit of the Norteño gang.

*Charges, Verdicts and Sentences*

Vigil and Latham were each charged with shooting at an inhabited dwelling with a gang enhancement allegation, based on the shootings at Donnelly Circle and Santoni Lane. In addition, each was charged with the substantive crime of active participation in a street gang. The chart below reflects the jury's verdicts:

| VERDICT | | | |
|---------|---|---|---|
| CT. | OFFENSE/ENHANCEMENT | LATHAM | VIGIL |
| 1 | Shooting at an inhabited dwelling (§ 246) (Donnelly Circle) | Guilty of lesser included offense (§ 246.3—grossly negligent discharge of firearm) | Not guilty |
| 1a | Gang enhancement to count 1 (§ 186.22, subd. (b)(4)) | True | N/A |
| 2 | Shooting at an inhabited dwelling (§ 246) (Santoni Lane) | Guilty | Guilty |
| 2a | Gang enhancement to count 2 (§ 186.22, subd. (b)(4)) | True | True |
| 3 | Active membership in a street gang (§ 186.22, subd. (a)) | Not guilty | Not guilty |

After denying defendants' motion for new trial, the trial court sentenced Latham to the middle term of two years plus five years for the gang enhancement on count 1. Latham also received an indeterminate term of 15 years to life (owing to the gang enhancement) on count 2, resulting in a total aggregate state prison sentence of 22 years to life.

The trial court sentenced Vigil to an indeterminate term of 15 years to life on count 2, the prescribed sentence for a section 246 conviction when coupled with a true finding on the gang enhancement. (§ 186.22, subd. (b)(4)(B).)

## DISCUSSION

### I. Juror Misconduct—Factual Background

Prior to trial, the trial judge instructed the jury: "Don't do any research on your own, and don't do any research as a group. You're not to use a dictionary or other reference materials. You're not to investigate the facts or the law. *Don't conduct any tests or experiments.* Don't go visit the scene of any event involved in this case." (Italics added.)

After the verdict, Vigil moved for a new trial based on juror misconduct. Vigil's counsel, Jeff Raven, filed a declaration stating that, at the conclusion of the trial, he asked Juror No. 2 why, if the jury acquitted his client of count 1 (the Donnelly Circle shooting), they found him guilty on the second count (the driveby shooting at Santoni Lane). In other words, if the jurors found Vigil did not know that Latham was going to do the first shooting, "why would you impart [*sic*] knowledge to him on the second shooting?" Juror No. 2 answered, in substance, "Mr. Raven, do you know how difficult it is to raise a rifle out of the window from the passenger seat? You would have to maneuver like this, turn this way, move back a foot or two. Its [*sic*] not easy. It takes time. And *I know, I did it with a broomstick.*" (Italics added.)

Juror No. 10 provided an affidavit stating that "[d]uring jury deliberations, when it was his turn to speak, a juror that I don't recall his name, but was a teacher, told jury members that he had conducted an experiment at home where he sat in his car as a passenger and had a broomstick, pretending he was shooting at a house. The juror said that after his experiment, he felt that one of the shootings was intentional and deliberate."

Juror No. 11 submitted an affidavit stating that Juror No. 2 told the jury about the results of an experiment he had done at home "to determine if Joshua Latham can with his right hand, lower the car window and quickly stick the rifle out." Juror No. 2 said he tried the experiment using a broomstick both right handed and left handed. He felt that if the shooter was right handed, it would be a lot less difficult than if he was left handed. The remarks were made toward the end of deliberations, when the jury was unable to come up with a unanimous vote.

Vigil also presented the affidavit of defense investigator James Peoples. Peoples averred that the following statements were made to him by Juror No. 2: (1) he conducted an experiment to see how difficult it would be for a right-handed person to "poke" a gun out of a passenger window of a car; (2) during deliberations, he "probably" said something to the effect that it was "unlikely that the driver [(Vigil)] wouldn't be aware that [Latham] was going to shoot a rifle because [Latham] would have to jack around inside the car with the gun"; and (3) that he "probably" also told the jurors, "I tried it with a broom[;] I don't think you can do it." (Italics omitted.) While Juror No. 2 initially agreed to sign an affidavit, he subsequently made himself unavailable.

The prosecutor opposed the motion for new trial but did not submit any evidence to controvert the defense affidavits. Vigil's counsel requested that the court conduct an evidentiary hearing, so that it could have the benefit of Juror No. 2's sworn testimony.

The trial court began the hearing by acknowledging that it had received the affidavits of two jurors, which were "competent evidence" regarding Juror No. 2's statements to his fellow jurors. Accordingly, the court accepted the truth of the allegations that Juror No. 2 had made the subject comments, just as if Juror No. 2 had signed an affidavit acknowledging them.

The trial judge also found that in performing the broomstick experiment, Juror No. 2 committed misconduct.[2]

Nevertheless, the court found that the experiment was not "so unusual" as to be prejudicial under the facts of the case. The trial judge reasoned that the

---

[2] The court's exact words were: "Should the juror have done it? No. That's an easy one. This is not the type of thing that if the juror had asked ahead of time, Judge, do you mind if I do this when I go home tonight that I would have said yes. I would have said, no, you cannot. You're told not to do those types of things. [¶] But the question is whether it is so unusual that it becomes prejudicial, and based on all of the evidence in the case, it cannot be seen to be unusual and prejudicial in that sense."

subject matter of the experiment was a matter of such "common experience that people could talk about it rationally and reasonably. It's not something that is completely without common experience." Second, the court found the evidence that Vigil knew Latham would shoot the rifle out of the car during the Santoni Lane shooting so "overwhelming" that the misconduct "[did] not interfer[e] with the jury's work on that." Accordingly, the motion for new trial was denied.

## II.   Juror Misconduct—Analysis

Vigil contends the judgment should be reversed due to irremediable and prejudicial jury misconduct. The claim is, in essence, an argument that the trial court erred in denying Vigil's motion for new trial. For the reasons that follow, we agree.

### A.   *Principles of Review*

■   "When a defendant moves for a new trial based on jury misconduct, the trial court undertakes a three-part inquiry. 'First, the court must determine whether the evidence presented for its consideration is admissible. . . . [¶] Once the court finds the evidence is admissible, it must then consider whether the facts establish misconduct. . . . [¶] Finally, if misconduct is found to have occurred, the court must determine whether the misconduct was prejudicial.' " (*People v. Sanchez* (1998) 62 Cal.App.4th 460, 475 [72 Cal.Rptr.2d 782].)

The trial court accepted the truth of Juror No. 2's comments as reported by the defense affidavits, and thus its ruling did not depend upon a resolution of conflicting evidence. Since the court's denial of the new trial motion was based on undisputed facts, we apply a de novo standard of review to answer two remaining questions: (1) Did Juror No. 2's experiment and report of its results to the deliberating jurors constitute misconduct? and (2) If so, was the misconduct prejudicial?

### B.   *Juror Misconduct Occurred*

■   It is absolutely forbidden for jurors to do their own investigation outside the courtroom. (*People v. Conkling* (1896) 111 Cal. 616, 628 [44 P. 314] (*Conkling*).) However, " '[n]ot every experiment constitutes jury misconduct. "[J]urors must be given enough latitude in their deliberations to

permit them to use common experiences and illustrations in reaching their verdicts." ' " (*People v. Bogle* (1995) 41 Cal.App.4th 770, 778 [48 Cal.Rptr.2d 739] (*Bogle*).) Thus, jurors may, as a body, "engage in experiments which amount to no more than a careful evaluation of the evidence which was presented at trial." (*Bell v. State of California* (1998) 63 Cal.App.4th 919, 932 [74 Cal.Rptr.2d 541] (*Bell*).) They may also "bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience." (*People v. Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676].)

The distinction usually turns on whether the juror's investigation stayed within the parameters of admitted evidence or created new evidence, which the injured party had no opportunity to rebut or question. In the words of the California Supreme Court: "Not every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the ' "scope and purview of the evidence." ' [Citation.] What the jury cannot do is conduct a new investigation going beyond the evidence admitted." (*People v. Collins* (2010) 49 Cal.4th 175, 249 [110 Cal.Rptr.3d 384, 232 P.3d 32] (*Collins*).)

In the seminal case of *Conkling*, a defendant on trial for murder claimed self-defense. The distance between the victim and the defendant was important and the victim's clothes revealed no powder marks. During deliberations, two jurors borrowed a rifle similar to the murder weapon, went to the outskirts of the city, and test-fired the rifle to determine at what distance a rifle discharge would leave powder marks on their clothing. (*Conkling, supra,* 111 Cal. at p. 627.) The California Supreme Court found prejudicial misconduct because the jurors conducted an experiment outside the trial setting, which created new evidence directly related to a "vital issue" in the case. (*Id.* at pp. 627–628.)

In *Bell*, the plaintiff sued various public entities for battery and false imprisonment when, in a case of mistaken identity, two officers grabbed the plaintiff and twisted his body into an awkward position, causing him injuries. (*Bell, supra,* 63 Cal.App.4th at p. 925.) " 'During the deliberations Juror [B.] advised all the other jurors that she and some other person, not a member of the jury, had attempted to recreate the sequence of events when Plaintiff's arms were placed up behind his back. She claimed that she fell over when she tried to do it. Based on this out of court recreation [*sic*: reenactment] of

events she expressed her disbelief in the Plaintiff's testimony on this point and therefore as to his entire testimony.' " (*Id.* at p. 930.)

The appellate court in *Bell* affirmed an order granting a new trial based on jury misconduct. Quoting from the trial court's written ruling, the *Bell* court found the juror committed misconduct in at least three respects: " '[F]irst, the juror was obviously discussing the case outside the court with other persons in violation of the direct order of the court; second, the juror attempted to simulate the events at the scene; and, third, the fact of the experiment and its results were passed [on to] the other jurors.' " (*Bell, supra*, 63 Cal.App.4th at pp. 932–933.) Due to a multiplicity of factors, the incident the juror was trying to reproduce was not subject to experimentation. Thus, the experiment was not " 'within the lines of offered evidence,' " and constituted prejudicial juror misconduct. (*Id.* at pp. 933–934.)

In *People v. Castro* (1986) 184 Cal.App.3d 849 [229 Cal.Rptr. 280] (*Castro*), a defendant was found guilty of arson arising from a riot at a county jail. A correctional officer testified he used binoculars to identify the defendant as a participant in the arson. During deliberations, a juror " 'went home and used binoculars to see if [the officer] could have possibly seen what he . . . said he did,' " and then reported his finding to the other jurors. (*Id.* at p. 852.) The Court of Appeal, Fifth Appellate District, reversed an order denying a new trial, finding that the juror's actions constituted an improper experiment. There was no showing that the juror's binoculars were similar to those used by the officer or that the lighting conditions and distances were similar to the conditions at the time of the officer's observation. (*Id.* at pp. 853–854.) The *Castro* court concluded that the juror's experiment "enabled [him] to receive evidence outside the presence and knowledge of [the defendant] going to the crucial element in the . . . case, the identity of the [defendant]." (*Id.* at p. 854.)

These cases stand in contrast to those finding no misconduct, such as situations where the jurors employed their own reasoning skills in a demonstrative manner or performed tests in the jury room that were confined to the evidence admitted at trial. (See, e.g., *Collins, supra*, 49 Cal.4th at pp. 250–252 [jury's use of string and a protractor to reenact various alternative positions of victim and defendant according to the evidence was not misconduct]; *id.* at p. 253 [drawing a scaled diagram based on the evidence for use in deliberations is not misconduct]; *Bogle, supra*, 41 Cal.App.4th at pp. 778–780 [jury's act of using keys to open a safe, all of which were admitted into evidence, constituted merely "closer analysis of a trial exhibit," not misconduct, as characterized by *Collins, supra*, 49 Cal.4th at p. 246]; *Locksley v. Ungureanu* (1986) 178 Cal.App.3d 457, 461 [223 Cal.Rptr. 737] [juror's act of driving his car with one eye covered to assess the breadth of his vision not

misconduct because it "did not invade a new field but merely [was] an experiment on an issue within the evidence, to wit, the ability of a one-eyed individual to drive"]; *Wagner v. Doulton* (1980) 112 Cal.App.3d 945, 948–950 [169 Cal.Rptr. 550] [drawing a scaled diagram based on the evidence for use in deliberations is not misconduct].)

██ Here, as the trial court properly found, the behavior of Juror No. 2 crossed the line into misconduct. The juror conducted an experiment in the absence of his fellow jurors and outside the courtroom with respect to a crucial issue in the case: whether the driver of the car knew in advance that Latham was going to commit a driveby shooting at the Santoni Lane location. The experiment, as described in the affidavits, ignored several variables that could have skewed the results: The juror used a broomstick as a surrogate for the rifle; he did not try to replicate the characteristics of the interior of Latham's car; he took no account of the height and weight of the driver or the shooter; and he assumed, without evidentiary support, that Latham had to roll down the window before aiming and shooting.[3] Juror No. 2 even appeared to assume, despite a lacuna in the evidence, that Latham was *right handed*.[4] The result of the experiment was then reported to the deliberating jurors as if it were scientific confirmation of the juror's views on a vital issue in the case.

The People claim the experiment was not misconduct because "[i]magining how the rifle could be maneuvered by the shooter in the passenger seat to shoot out the window and whether the driver would be aware of the movement were well within a juror's common experience." They also argue that because Juror No. 2 did not attempt to replicate the exact conditions that existed in the car at the time of the shooting, he did not create "new evidence." We are not persuaded.

Juror No. 2's conduct is far more similar to conducting an experiment outside the court to determine at what distance a rifle discharge would produce powder marks on clothing (*Conkling*), or using one's own pair of binoculars to attempt to determine what a prison guard might have seen in looking through *his* binoculars (*Castro*), than the cases that merely involve careful examination of exhibits or conducting a test or demonstration that did not stray beyond the admitted evidence.

The fact that the jurors *could have* reached the same conclusion as Juror No. 2 did by "[i]magining how the rifle could be maneuvered" does not, as

---

[3] Chaney testified that he believed, but was not certain, that the window was rolled down during the entire trip from Donnelly Circle to Santoni Lane.

[4] At oral argument, Vigil's counsel represented that Latham was, in fact, left handed. We have examined the record but cannot find conclusive evidence that this was the case. Nevertheless, the important point is that the juror made an assumption about Latham that was not based on the evidence.

the People suggest, mean that he committed no misconduct. The rifle had been admitted into evidence and was available in the jury room. The jurors could, without committing misconduct, have taken it and used it to reenact the Santoni Lane shooting for purposes of debate, applying their own common sense and life experience to Chaney's trial testimony. (See *People v. Cumpian* (1991) 1 Cal.App.4th 307, 313–315 [1 Cal.Rptr.2d 861] (*Cumpian*) [jurors properly reenacted manner in which defendant was carrying duffelbag as described by testimony].)

This is not what happened. Juror No. 2's homemade experiment produced new evidence " 'without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain.' " (*Collins, supra,* 49 Cal.4th at p. 243, quoting *Higgins v. L. A. Gas & Electric Co.* (1911) 159 Cal. 651, 656–657 [115 P. 313].) We conclude juror misconduct occurred.

### C.   *The Misconduct Was Prejudicial*

"Jury misconduct raises a presumption of prejudice, and ' "unless the prosecution rebuts that presumption . . . , the defendant is entitled to a new trial." ' " (*Cumpian, supra,* 1 Cal.App.4th at p. 312.) The presumption of prejudice may be rebutted by an affirmative evidentiary showing that prejudice does not exist or " 'by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party.' " (*People v. Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127].) " 'Whether a defendant has been prejudiced . . . depends upon "whether the jury's impartiality has been adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted." ' " (*Cumpian,* at p. 312.)

Applying these precepts, it is initially clear that the misconduct of Juror No. 2 raised a presumption of prejudice and that the People, having offered no evidence whatsoever in opposition to the motion for new trial, did not make an " 'affirmative evidentiary showing' " to the contrary. (*Cumpian, supra,* 1 Cal.App.4th at p. 312.) We therefore examine whether the misconduct resulted in a " ' "reasonable probability of actual harm" ' " to the complaining party. (*Ibid.*) We find that it did.

The jurors obviously struggled with the issue of Vigil's liability as an accomplice to the Santoni Lane shooting. They acquitted him entirely of the first shooting, and thus entertained a reasonable doubt that he knew Latham would get out of the car and open fire at Donnelly Circle. The affidavits establish that the jurors were, at some point, unable to agree on a verdict and that Vigil's culpability for the second shooting consumed most of their

deliberations. The jury made several requests for clarification from the judge. It retired to begin deliberations just before noon on Thursday, continued its deliberations on Friday, and did not return a verdict until approximately 3:00 p.m. on Monday.

Juror No. 2's report of his experiment could well have had a significant influence on jury deliberations. The experiment created new evidence outside the courtroom, contradicted an asserted defense and lightened the prosecution's burden of proof on a material issue—whether Vigil knew that Latham was going to commit a driveby shooting at the Santoni Lane residence.[5] Juror No. 2 was a college professor, thereby enjoying enhanced stature in the eyes of his fellow jurors and lending credence to his conclusions. His reported experiment could well have struck a decisive blow in favor of conviction by causing one or more jurors to shortcut the deliberative process. This type of misconduct cannot be deemed harmless. " 'The fact that the experiment was performed by one juror, . . . outside of the court room and the deliberations, is more egregious and resulted in outside influences or extrinsic evidence permeating the jury's deliberations on perhaps the key factual determination in the case.' " (*Bell, supra,* 63 Cal.App.4th at p. 933.)

The Ninth Circuit Court of Appeals has observed that reversible error for juror misconduct "commonly occurs where there is a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, and where the misconduct relates directly to a material aspect of the case." (*Marino v. Vasquez* (9th Cir. 1987) 812 F.2d 499, 506, citing *U.S. v. Bagnariol* (9th Cir. 1981) 665 F.2d 877, 885.) The misconduct here satisfies both prongs of this test.

We conclude that the presumption of prejudice was not rebutted. Vigil's conviction must be reversed.[6]

### III.–V.*

---

[5] The trial court's observation that the evidence overwhelmingly showed Vigil had such knowledge, even if true, does not show lack of prejudice. Where the jury has been exposed to improper outside influences, the test for prejudice is not the strength of the prosecution's case, but whether the impartiality of the jury has been compromised. (See *People v. Nesler* (1997) 16 Cal.4th 561, 578–579 [66 Cal.Rptr.2d 454, 941 P.2d 87].)

[6] Although Latham purports to join in *all* of Vigil's appellate arguments he is not entitled to a reversal on this ground. It is self-evident that the juror misconduct we have cited affected only Vigil's conviction.

*See footnote, *ante,* page 1474.

## VI. Corrections to Latham's Abstracts of Judgment

We note several errors in the second amended abstracts of judgment (one for each conviction) for defendants Vigil and Latham. Because we reverse the judgment as to Vigil, we need address only those errors found in defendant Latham's two abstracts (all references to the abstract in this part are to the second amended abstracts of judgment).

*Latham's Determinate Sentence Abstract:*

In item 1, the abstract incorrectly lists count 1a (rather than count 1) for the principal conviction, i.e., negligent discharge of a firearm in violation of section 246.3;

In item 2, the enhancement for count 1a is properly noted. However, the enhancement was orally modified by the trial court from section 186.22, subdivision (b)(4) to section 186.22(b)(1)(B). Hence, subdivision (b)(4) should be stricken and subdivision (b)(1)(B) substituted.[9]

*Latham's Indeterminate Sentence Abstract:*

In item 1, the abstract incorrectly lists count 2a (rather than count 2) for the principal conviction; count 2 should be substituted.

In item 2, the enhancement for count 2a is omitted. Item 2 should be corrected to include the enhancement set forth in section 186.22, subdivision (b)(4). The sentence imposed should also contain an "*" (an asterisk) reflecting the correct term in item 6.a* as 15 years to life.

## DISPOSITION

The judgment against defendant Vigil is reversed. The trial court is directed to vacate its order denying him a new trial and enter a new order granting the motion.

---

[9] In item 14, local conduct credits awarded are correct and will not change as a result of recent amendments to section 4019. Those amendments do not operate to modify defendant Latham's entitlement to additional presentence credit, as he was committed to state prison for a serious felony. (See §§ 4019, former subds. (b)(2) & (c)(2) [as amended by Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 28, § 50, eff. Jan. 25, 2010], 2933, subd. (e)(3) [as amended by Stats. 2010, ch. 426, § 1, eff. Sept. 28, 2010], 1192.7, subd. (c)(33).)

The judgment against defendant Latham is affirmed. However, the abstracts of judgment as to defendant Latham are ordered corrected in accordance with part VI. of the Discussion. The superior court shall forward a certified copy of the corrected abstracts of judgment to the Department of Corrections and Rehabilitation.

Raye, P. J., and Blease, J., concurred.

The petition of appellant Joshua Lawrence Latham for review by the Supreme Court was denied April 27, 2011, S190958.