Filed 9/8/14  P. v. Harris CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B249905 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA380163) |
| ANNETTE HARRIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge.  Affirmed.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Annette Harris was convicted by jury of the first degree murder of Marietta Goodridge. (Pen. Code, § 187, subd. (a).)[1] Appellant sought disclosure of juror information after learning that the jurors conducted what she contended was an unauthorized experiment during jury deliberations. The trial court found that the jurors had not conducted an unauthorized experiment and accordingly denied her motion. Appellant contends that the trial court abused its discretion in so ruling. We disagree and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

Goodridge lived in a house on Budlong Avenue with her son, Victor Goodridge.[2] Appellant was Victor's girlfriend and occasionally stayed at Goodridge's house. Goodridge was 72 years old. Her grandson, Jonathan Cole, and his former girlfriend, Inalee Thomas, lived in Goodridge's home occasionally, but Goodridge told them to move out on January 6, 2011, after Goodridge had a dispute with Cole about money.

On January 16, 2011, at approximately 9:30 a.m., Cole and Thomas stopped at Goodridge's house on their way to church. Cole went inside the house to cook something and to get a change of clothes, and he overheard appellant telling Goodridge bad things about Cole. Cole became upset and told appellant to leave. Cole went outside and told Thomas, who was waiting in the car, to "go inside and basically shut [appellant] up." Goodridge told Cole and Thomas to go to church, so they left and went to church.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     We will refer to Victor Goodridge by his first name in order to avoid confusion.

2

Enrique Meyers lived in a house across the street from Goodridge and was sitting on his front porch on the day of Goodridge's murder. He saw Cole and Thomas drive up and park their car, and he saw Cole go inside Goodridge's house. Meyers saw Cole come outside and yell at Thomas to "go inside the house and tell this girl to shut up." Shortly after Thomas went into Goodridge's house, Meyers saw Cole and Thomas come back out and leave for church. After Cole and Thomas left, Meyers saw Goodridge come out her front door and yell, "Get the hell out of my house," then go back inside the house.

Cole and Thomas returned to Goodridge's house after church, and Cole went inside the house. When Cole entered the house, he saw Goodridge face down on the floor, with blood on the back of her head. He started screaming and ran out of the house and told Thomas his grandmother was dead. Thomas went in the house, saw Goodridge, and called 911 from a phone in the living room. The china cabinet in the living room had been knocked over.

Cole and Thomas heard noises from Victor's room in the back of the house, so Cole went to investigate. Cole held a chair and asked if anyone was there. Cole initially did not see anyone when he went into Victor's room, but then appellant emerged from under the blankets on Victor's bed. Cole told appellant his grandmother was dead and told her to go outside.

In order to enter the living room from the bedroom, appellant needed to crawl under the overturned cabinet. When appellant went to the living room and saw Goodridge, she fell on the floor next to the body and said, "Grandmother." Cole told appellant not to touch the body and to go outside.

After going outside, Cole noticed blood stains on appellant's clothing, scratches on her face, and blood "splats" on her neck. Appellant told officers that she had not seen anything because she was sleeping. Sergeant Christopher

3

Mayberry of the Los Angeles Police Department noticed that appellant had an abrasion on her lip, discoloration on her forehead, and an injury on her neck.

Detective Charles Geiger similarly noticed that appellant had injuries on her face, neck, and hands. Detective Geiger also saw that appellant was not wearing any shoes and that her clothes were stained with blood.

Officers found no evidence of forced entry into the home.

Victor testified that he left Goodridge's house at 6:30 on the morning of the murder and that Goodridge was alone in the house when he left. He spent the day at a friend's house, and when he returned around 2:00 p.m., he saw numerous police cars.

Police criminalists collected evidence at the scene, including the following: bloody scissors near Goodridge's body, shoes in the back bedroom with blood on them, hair-like material in Goodridge's hand, and a candlestick holder that tested positive for blood stains. A DNA analysis of a swab from the candlestick holder indicated two contributors. The major contributor was Goodridge, and the minor contributor was appellant. The criminalists also found blood on the door, walls, furniture, and ceiling.

The People introduced extensive testimony and photographs regarding the blood found in the house, on items in the house, and on appellant's clothing. In particular, retired Los Angeles Police Department Detective Richard Marks testified that there were blood stains, not spatter, on the front and back of appellant's jeans. There were blood stains on the sleeve and left side of her shirt, and blood spatter on the back of her shirt. Detective Marks opined that the blood spatter on the back of appellant's shirt indicated that she was bent forward, swinging a bloody object downward, casting blood off onto the back of her shirt. He pointed out that, when appellant came out of Victor's room, she was wearing

4

socks, and there was no blood on her socks. However, tennis shoes found in the bedroom next to the bed had blood on them. Blood spatter on the shoes suggested that they were spattered with a "bleeding source" on the floor. Detective Marks found it significant that there was no blood on the soles of the shoes, explaining that, if a person stepped in a puddle of blood, there would be blood spatter on the opposite pant leg. There was blood spatter inside appellant's left ear.

*Defense Evidence*

On January 9, 2011, a week before her murder, Goodridge went to a Los Angeles Police Department station to report criminal threats made against her by her grandson, Cole. She reported that, on January 6, she argued with Cole about money and chores and told him to leave her house. Before leaving, Cole told her, "I'm going to burn the house down with you in it."

Appellant presented evidence that there was no fingerprint evidence linking her to the murder.

Appellant testified on her own behalf. She testified that she and Cole arrived at Goodridge's house at approximately the same time on January 16, 2011, and that Goodridge answered the door. Appellant went into Victor's room, fell asleep, and was awakened when Cole came into the room. Cole told her to go into the living room, where she saw Goodridge. Because of the overturned cabinet, Cole walked through the kitchen to get to the living room, but appellant crawled under the overturned cabinet to get from the bedroom to the living room. Appellant denied killing Goodridge.

Appellant explained that the scratches on her neck were caused by dogs that belonged to a friend who lived in the neighborhood. On the morning of Goodridge's murder, shortly before appellant went to Goodridge's house, she was

5

sitting on her friend's step waiting for him when his dogs came out and jumped on her.

*Procedural Background*

Appellant was charged in an amended information with one count of murder. The information alleged that appellant personally inflicted great bodily injury upon Goodridge, who was 70 years of age or older, and that appellant personally used a deadly and dangerous weapon. (§§ 12022.7, subd. (c), 12022, subd. (b)(1).)

The jury found appellant guilty and found true the allegation that appellant personally used a deadly and dangerous weapon.[3]

Appellant filed a petition for access to personal juror information pursuant to Code of Civil Procedure section 237. In support of her petition, appellant filed a declaration from Erin Dixon, a Deputy Alternate Public Defender who was a colleague of appellant's counsel. Dixon stated that, after trial, she asked the jurors if they would be willing to speak with her. Several jurors told her that the jury initially was split six to six, but that one of the jurors then "suggested that they put a picture of [appellant's] jeans on top of a picture of [her] shoes to see if the blood would 'match.' [¶] The jurors then stated that after they put a picture of [appellant's] jeans on top of a picture of [her] shoes, they were satisfied that the blood 'matched.'" Dixon "did not ask the jurors what they meant by 'match.'" Appellant contended that defense counsel needed to interview the jurors to support her new trial motion, which would include the issue of juror misconduct.

---

[3] The allegation that Goodridge was 70 years of age or older was not submitted to the jury.

6

After hearing argument on the motion, the trial court denied appellant's request for personal juror information. The court reasoned that the jurors had not conducted an experiment but instead had merely compared photographs that were in evidence.

The trial court denied appellant's motion for a new trial. The court sentenced appellant to a term of 25 years to life on the murder count, plus one year for the personal use of a deadly weapon, for a total of 26 years to life. Appellant filed a timely notice of appeal.


**DISCUSSION**

Appellant contends that the trial court abused its discretion in denying her motion for disclosure of juror information. She argues that she made a prima facie showing that the jurors engaged in an improper experiment that constituted jury misconduct. We disagree.

Appellant's request for juror information is governed by Code of Civil Procedure sections 206 and 237. "After a jury's verdict is recorded in a criminal jury proceeding, the court's record is 'sealed,' meaning all 'personal juror identifying information of trial jurors . . . consisting of names, addresses, and telephone numbers,' is extracted or otherwise removed from the court record. [Citation.] Pursuant to Code of Civil Procedure section 206, subdivision (g), 'a defendant or defendant's counsel may . . . petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose.' . . . 'The court shall set the matter for hearing if the petition and supporting declaration *establish a prima facie showing of good cause* for the release of the personal juror identifying information . . . .'" (*People v.*

7

*Carrasco* (2008) 163 Cal.App.4th 978, 989 (*Carrasco*), citing Code Civ. Proc., § 237, subds. (a)(2)–(3), (b).) "Denial of a petition filed pursuant to Code of Civil Procedure section 237 is reviewed under the deferential abuse of discretion standard. [Citations.]" (*Id.* at p. 991.)

In *People v. Collins* (2010) 49 Cal.4th 175 (*Collins*), the California Supreme Court explained the framework for analysis of a jury misconduct claim based on experimentation: "'It is a fundamental rule that all evidence shall be taken in open court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern the use of exhibits by the jury. They *may use* the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter. They *may carry out experiments* within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by *discoveries* from such evidence which will *not fall fairly within the scope and purview* of the evidence, then, manifestly, the jury has been itself *taking evidence* without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain.' [Citation.] . . .

"Not every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the "'scope and purview of the evidence."' [Citation.] What the jury cannot do is conduct a new

8

investigation going beyond the evidence admitted." (*Collins*, *supra*, 49 Cal.4th at pp. 243, 249.) Pursuant to the framework set forth in *Collins*, we conclude that the trial court did not abuse its discretion in denying appellant's motion for disclosure of juror information.

As explained above, appellant's motion was supported by Dixon's declaration, stating that several jurors told her the jury was evenly split until they placed a picture of appellant's jeans on top of a picture of her shoes and decided that the blood "matched." The trial court found that appellant failed to establish a prima facie showing of misconduct. The court explained that, "In my view in this case, the jurors did, according to the declaration, what jurors are expected to do, and that is to examine the evidence, and in this case they compared photographs that were in evidence. Either counsel could have done the same comparison in front of them during argument, or during presentation of the evidence, and the fact that they gleaned something from that comparison that the parties didn't expect or didn't mention, does not mean they conducted an improper experiment."

*Collins* discussed various cases to illustrate "the distinction between an experiment that results in the acquisition of new evidence, and conduct that is simply a 'more critical examination' of the evidence admitted. The former is misconduct; the latter is not." (*Collins*, *supra*, 49 Cal.4th at p. 244.) The jury's conduct here, comparing the two photographs, falls into the category of "conduct that is simply a 'more critical examination' of the evidence admitted," and therefore did not constitute misconduct. (*Ibid.*)

*People v. Bogle* (1995) 41 Cal.App.4th 770 (*Bogle*) is instructive. In *Bogle*, a safe belonging to the murder victims and a set of keys belonging to the defendant were admitted into evidence. The defendant testified and identified each key but did not say that any of the keys opened the victims' safe. During jury

9

deliberations, the jury inserted one of the keys into the safe and unlocked it. On appeal, the defendant claimed the trial court erred in denying his motion for a mistrial, which argued that the jury conducted a prohibited experiment. The appellate court affirmed, reasoning that the jury's "[p]alpation of the safe and the keys was 'within the lines of offered evidence.' [Citation.]" (*Id.* at p. 779.) The court rejected the defendant's argument that "the experiment invaded a 'new field' not presented at trial. [Citation.]" (*Id.* at p. 779.) The jury "was entitled to determine, from the evidence it was given, the character and extent of the defendant's relationship to the safe. Trying the keys on the safe was an exercise in that pursuit, not a foray into a new field." (*Id.* at p. 780.)

Similar to the evidence in *Bogle*, the photographs of appellant's jeans and shoes "were both properly introduced into evidence and, thus, were properly given to the jury for examination." (*Bogle*, *supra*, 41 Cal.App.4th at p. 779.) By comparing the photographs to determine if the blood "matched," the jurors here merely "reexamined the evidence in a slightly different context as an aid in reaching a verdict. [Citation.]" (*Id.* at p. 781.)

Appellant's reliance on *People v. Vigil* (2011) 191 Cal.App.4th 1474 (*Vigil*) is unavailing. In *Vigil*, one of the jurors admitted that he conducted an experiment at home to see how difficult it would be for a right-handed person to raise a rifle and point it out the window of a passenger seat of a car. During deliberations, he told the other jurors that, after sitting in his car as a passenger and using a broomstick to pretend he was shooting at a house, he decided that the shooting was intentional and deliberate. On appeal from the denial of the defendant's motion for new trial, the court explained that the distinction between permitted jury deliberations and jury misconduct "usually turns on whether the juror's investigation stayed within the parameters of admitted evidence or created new

10

evidence, which the injured party had no opportunity to rebut or question." (*Id.* at p. 1484.) The court found that the juror's experiment "crossed the line into misconduct." (*Id.* at p. 1486.) Not only did the juror "conduct[] an experiment in the absence of his fellow jurors and outside the courtroom with respect to a crucial issue in the case," but his experiment "ignored several variables that could have skewed the results," such as the defendant's height and weight, the characteristics of the interior of the car, and even whether the defendant was right or left handed. (*Ibid.*)

The conduct of the jury in *Vigil* is very different from the jury conduct alleged here. Here, the jurors did not rely on an extraneous item not admitted into evidence, such as the broomstick in *Vigil*. Nor did they conduct an experiment outside the court in reliance on variables and assumptions outside the scope of the evidence. Instead, the jurors' comparison of the blood in the two photographs is similar to "cases that merely involve careful examination of exhibits or conducting a test or demonstration that did not stray beyond the admitted evidence." (*Vigil*, *supra*, 191 Cal.App.4th at p. 1486.)

Appellant contends that the jurors' comparison of the photographs "was not a use in keeping with the testimony of the prosecution witnesses," because they "did not scrutinize the evidence for the purpose for which each was admitted." Appellant does not explain how the jurors' scrutiny of the photographs, which were admitted to establish her guilt of the offense, constituted an improper experiment. As *Collins* explained, "[t]he jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the '"scope and purview of the evidence."' [Citation.]" (*Collins*, *supra*, 49 Cal.4th at

11

p. 249.)  The jurors here did not stray outside the scope and purview of the evidence.  Instead, they "performed tests in the jury room that were confined to the evidence admitted at trial.  [Citations.]"  (*Vigil*, *supra*, 191 Cal.App.4th at pp. 1485-1486.)

Because appellant's motion did not show that the jury conducted an improper experiment, she failed to establish a prima facie showing of good cause for the release of the personal juror identifying information.  (*Carrasco*, *supra*, 163 Cal.App.4th at p. 989.)  The trial court accordingly did not abuse its discretion in denying her motion.[4]

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.              EDMON, J.*

---

[4]     Appellant's suggestion that the trial court erred in relying on a depublished opinion is unmeritorious.  The record indicates that the court relied on the principles established by *Collins* in making its decision.

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.