[No. C018686. Third Dist. Dec. 26, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH JAMES BOGLE, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II, III, and V of the Discussion.

**COUNSEL**

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, J. Robert Jibson and John A. O'Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NICHOLSON, J.**—The defendant, Joseph James Bogle, murdered Tom and Joan Bromley, then set fire to their house and shot himself in the head to cover up the murders. The defendant had lived with the victims and labored around the house in exchange for boarding.

During the trial, the prosecution presented evidence that the Bromleys' safe, which contained personal items belonging to them, was found by investigators in the defendant's room. The defendant testified the safe was in his room because one of the victims wanted him to use the contents to buy cocaine. He refused, but set the safe down in his room. The prosecution also introduced into evidence the defendant's keys, and the defendant purported to identify each key but did not say any key opened the safe.

During its deliberations, the jury found one of the defendant's keys opened the safe. This discovery showed the defendant had access to the inside of the safe and he lied about the key. The jury found the defendant guilty of arson and two counts of first degree murder with firearm enhancements. The trial court sentenced him to eight years in state prison for the arson conviction and consecutive terms of life without parole plus six years and four months for the murder convictions with their accompanying firearm enhancements.

On appeal, the defendant argues the court erred by denying his motion for a mistrial, made when the jury informed the court it had opened the safe with the defendant's key. He contends the jury conducted a prohibited experiment and, therefore, he was denied his right to a trial by jury and to be present when evidence is taken. He also argues the trial court erred by requiring his wife to testify at trial.

In the published portion of this opinion, we reject the defendant's contentions concerning the jury's experiment and his wife's testimony. The jury properly conducted an experiment within the lines of offered evidence to fulfill its obligations. In addition, the trial court properly required the defendant's wife to testify because the defendant committed the crimes against cohabitants. (Evid. Code, § 972, subd. (e)(1).) In the unpublished portion of the opinion, we reject the defendant's other contentions, finding no prejudicial error.

## FACTS

The prosecution's case was based on circumstantial evidence, and the defendant testified at trial, offering innocent explanations for much of the evidence. Nonetheless, following the well-established appellate rule, we recite the facts in the light most favorable to the judgment, drawing all reasonable inferences in support of the conviction. (*People* v. *Mincey* (1992) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

Tom and Joan Bromley, husband and wife, lived together in Sacramento. Tom had health problems and used crutches to get around. He customarily

carried $100 bills. Joan had three grown children by a previous marriage. Two of her children lived in Hawaii. According to her children, Joan never took off her wedding ring.

The Bromleys usually had someone live with them to help with the house and yard work in exchange for boarding. The defendant moved into their home under this arrangement in May 1991. He had recently separated from his wife.

After the Bromleys hired the defendant, Joan went to Hawaii to visit her son and daughter. She told her son she and Tom were having problems with the defendant and she intended to fire and evict him when she got home. During the same time period, Tom complained about the defendant during medical appointments. He remarked he asked the defendant to leave and the defendant refused.

Neighbors heard loud arguments and yelling coming from the Bromley home in late May and early June. A neighbor also heard what sounded like someone hitting someone else.

Joan returned home from Hawaii on June 1, 1991, and talked to her son on the phone. She told him she was going to fire and evict the defendant. She later told her daughter-in-law the same thing.

After Joan spoke with a friend on June 3, several of the Bromleys' friends and family tried to get in touch with them, without success. On either June 4 or June 5, neighbors heard five gunshots coming from the Bromley home.

Early in the morning of June 6, smoke poured from the Bromley home from a fire set, using gasoline, in the Bromleys' bedroom. The defendant was found lying in front of the house with a grazing gunshot wound to his head. His clothes smelled of gasoline, and Tom's automated teller machine card was in his pocket. Inside, the Bromleys were dead in their bedroom. Although their bodies were burned, they were dead well before the fire was set. Joan was killed by a single bullet wound to the head. Tom had four bullet wounds and several blunt trauma wounds, all to the head.

The police found many of the Bromleys' financial papers, credit cards, and wallets with the defendant's fingerprints on them in a trash can. At the bottom of the trash can, they found a suicide note written by the defendant to his wife. However, the note was torn up. The Bromleys' safe was found in the closet of the defendant's bedroom. It contained items belonging to the Bromleys, including Joan's wedding ring. The police also found a notebook

containing a story written by the defendant. It is an account of a person waiting to be shot in the head. The story graphically depicts what happens to a person's head when the bullet enters the head, bounces around, and exits.

Shortly after the murders and fire, the defendant's wife received from him two $100 bills in the mail. He had never before sent cash. The police also learned Tom's access to his bank account by his automated teller machine card had been blocked on June 5, 1991, after someone attempted three times to withdraw funds without the proper identification number.

Much more evidence was presented against the defendant, but, since the defendant does not challenge its sufficiency, it is unnecessary to recite all of it. Additional evidence relevant to the defendant's contentions on appeal is recounted in the discussion.

## DISCUSSION

## I

### Jury's Use of Physical Evidence

As stated, the police found a safe in the closet of the defendant's bedroom. They pried it open with a screwdriver. The safe contained jewelry belonging to the victims, including Joan's wedding ring, which she was wearing while in Hawaii. The defendant claimed that in late May, while Joan was in Hawaii, Tom brought the safe downstairs and asked the defendant to buy cocaine with the contents of the safe. The defendant refused. Nonetheless, he took the safe from Tom and put it in his own bedroom.

The investigators also found a set of keys, which the defendant claimed as his own, in the entryway of the house. At trial, the defendant identified the lock each key would open, but he did not say any of the keys opened the safe. Both the safe and the keys were sent to the jury room.

During its deliberation, the jury sent a note out to the court. The note revealed, by implication, that the jury tried to open the safe using the defendant's keys. The note said, "We have learned from the evidence something that was never raised in testimony. That is, one of the keys on [the defendant's] key ring works the safe. May we consider that as evidence?" Upon receiving the note and verifying one of the defendant's keys opened the safe, the court posed the jury's question to counsel.

The prosecutor argued the jury did nothing wrong in trying to open the safe with the keys and should be able to consider the discovery. He characterized the jury's actions as a "logical examination of the evidence," not an "outside experiment."

The defense cried foul, immediately moving for a mistrial. According to defense counsel, the jury violated the court's explicit instruction not to conduct experiments.[1] The relationship between the key and the safe, he asserted, was beyond the evidence presented to the jurors.

The trial court disagreed that the jury had conducted a prohibited experiment. Instead, the court compared the situation to one in which a jury is given a picture and sees something in the picture that adds insight into the case but was not pointed out during testimony. The court decided to allow the jury to consider its discovery but gave the following admonition: "You may consider the fact that you have determined that the key operates the lock. I recommend that you use caution in evaluating the significance or value of this evidence. I make this comment since neither party presented any evidence directly on this point or considered it at all. You do not know what evidence might have been offered by either party had they been aware of the fact in question."

■ On appeal, the defendant claims the trial court erred by denying his motion for a mistrial. He asserts the jury's discovery of the relationship between the key and the safe violated his right to trial by jury and his right to be present when evidence is presented.

■ "[N]ot every experiment constitutes jury misconduct. '[J]urors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdicts. [Citations.]' (*United States* v. *Avery* (6th Cir. 1983) 717 F.2d 1020, 1026.)" (*People* v. *Cumpian* (1991) 1 Cal.App.4th 307, 316 [1 Cal.Rptr.2d 861].) "It is a fundamental rule that all evidence shall be taken in open court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern the use of . . . exhibits by the jury. They may use the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter. They may carry out experiments *within the lines of offered evidence*, but if their experiments shall *invade new fields* and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence

[1]Concerning experiments, the court instructed the jury as follows: "You must decide all questions of fact in this case from the evidence received in this trial and not from any other source. [¶] You must not make any independent investigation of the facts or the law or consider or discuss facts as to which there is no evidence. This means, for example, that you must not on your own visit the scene, conduct experiments, or consult reference works or persons for additional information. . . ." (See CALJIC No. 1.03.)

which it is not possible for the party injured to meet, answer, or explain." (*Higgins* v. *L.A. Gas & Electric Co.* (1911) 159 Cal. 651, 656-657 [115 P. 313], italics added.)

Palpation of the safe and the keys was "within the lines of offered evidence." (*Higgins* v. *L.A. Gas & Electric Co.*, *supra*, 159 Cal. at p. 657.) They were both properly introduced into evidence and, thus, were properly given to the jury for examination. On this point there is no real dispute.

The defendant argues the experiment invaded a "new field" not presented at trial. (*Higgins* v. *L.A. Gas & Electric Co.*, *supra*, 159 Cal. at p. 657.) Since the issue of whether one of his keys fit the safe never came up during trial, the jury's discovery, the defendant contends, was new evidence he never had the opportunity to rebut.

Contrary to the defendant's implication, the term "field," as used in *Higgins*, does not mean one specific fact. A "field," instead, is an area of inquiry, such as the extent of the defendant's access to the contents of the safe or whether the defendant was a credible witness. This broader definition, although not expressed, is implied in the Supreme Court's discussion in *Higgins* v. *L.A. Gas & Electric Co.*, *supra*, 159 Cal. at pages 657-659.

The *Higgins* court described a federal case in which the defendant was prosecuted for smuggling prepared opium. An element of this crime was that the opium was prepared for smoking, that is, it was burnable. While the prosecution presented no evidence the opium was burnable, the court invited the jury to determine by experiment whether it would burn. On appeal, the defendant's conviction was reversed because the prosecution did not prove an essential element of the crime; instead, the proof of the element was left to the jury and the defendant was not given a chance to rebut that proof. (*Higgins* v. *L.A. Gas & Electric Co.*, *supra*, 159 Cal. at pp. 657-658, discussing *Wilson* v. *United States* (9th Cir. 1902) 116 Fed. 484.)

The *Higgins* court also described a Virginia case in which assassins killed a group of unsuspecting victims. Winchester rifle cartridge shells were recovered from the scene and presented to the jury. The prosecution also introduced a matching caliber Winchester rifle recovered from the defendant. During the presentation of evidence the rifle was exhibited but was not taken apart. In an effort to rebut the prosecution's evidence, the defense showed the marks of the firing pin on the cartridge shells was different from the marks on the shells recovered from the scene. During deliberations, however, the jury took the rifle apart and determined that someone had tampered with the plunger or firing pin. The Virginia appellate court upheld

the conviction. The *Higgins* court approvingly commented: "A more acute prosecuting attorney might have caused the examination to have been made in open court and thus have demonstrated the trick and fraud, but his failure to do so afforded no ground for overthrowing the verdict of an intelligent and scrutinizing jury which, making its own examination of the evidence admitted to prove or disprove the very fact, discovered that the plunger 'had been recently tampered with and fixed for the occasion of the trial.'" (*Higgins* v. *L.A. Gas & Electric Co.*, *supra*, 159 Cal. at pp. 658-659, discussing and quoting *Taylor* v. *Commonwealth* (1893) 90 Va. 109 [17 S.E. 812].)

In the opium case, the trial court left to the jury to establish for itself an element of the crime. Thus, the jury was called upon, inappropriately, to invade a new field of inquiry. In the rifle shell case, on the other hand, the defendant raised the issue of whether his rifle was the one that fired the shells found at the scene of the crime. By taking the rifle apart and determining whether someone had tampered with it, the jury did not invade a new field; it used the evidence at hand to come to its own conclusion concerning the true facts.

█ Generally, the defendant's access to the safe and its contents was an issue. The investigators found the safe in his bedroom, which circumstance was suspicious because it contained personal items belonging to the victims. During his testimony, the defendant attempted to give an exculpatory explanation for the location of the safe. In considering the importance of the safe and its location and the defendant's actions with respect to the safe, the jury was entitled to determine, from the evidence it was given, the character and extent of the defendant's relationship to the safe. Trying the keys on the safe was an exercise in that pursuit, not a foray into a new field.

More pointedly, during direct examination by his counsel, the defendant purported to identify each key on the key ring. This invoked the jury's duty to determine the veracity of the testimony. █ "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People* v. *Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758], overruled on another ground, *People* v. *Burton* (1961) 55 Cal.2d 328, 352 [11 Cal.Rptr. 65, 359 P.2d 433].) █ Having testified concerning the use of each key, the defendant cannot now complain the jury tested the truth of his testimony by using the available evidence.

The situation here is analogous to a Louisiana rape case. (*State* v. *Gaston* (La. 1982) 412 So.2d 574.) There the victim identified the defendant by a

skin discoloration on his shoulder, visible at the time of the offense because he was wearing a tank top. The tank top was introduced into evidence. In addition, the jury was shown the discoloration on the defendant's naked shoulder. After retiring to deliberate, the jury asked and was allowed to see the defendant dressed in the tank top. It intended to determine whether the discoloration was visible when the defendant wore the tank top, a specific fact not presented to the jury during the presentation of the case. On appeal, the defendant asserted that allowing the jury, during deliberations, to view the defendant dressed in the tank top was error. The court disagreed. It held the jury did not see new evidence. Instead, the jurors merely reexamined the evidence in a slightly different context as an aid in reaching a verdict. (*Id.* at pp. 576-577.)

As in *Gaston*, the jury here did not consider new evidence. While the jurors reexamined the evidence in a slightly different context, it was within the "scope and purview of the evidence" presented to them by the prosecution and defense and did not invade a new field. (*Higgins* v. *L.A. Gas & Electric Co.*, *supra*, 159 Cal. at p. 657.) This careful scrutiny of the evidence was not a prohibited experiment. There is "no ground for overthrowing the verdict of [this] intelligent and scrutinizing jury . . . ." (*Id.* at p. 659.) Accordingly, the trial court properly denied the motion for a mistrial.

## II, III*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## IV

### Privilege Not to Testify Against Spouse and Confidential Marital Communication Privilege

The defendant claims it was error to require the defendant's wife, Corinne, to testify against him because both the privilege not to testify against a spouse (Evid. Code, § 970) and the confidential marital communications privilege (Evid. Code, § 980) apply. This contention is without merit.

Before trial, the defendant objected to the admission of testimony by Corinne. He asserted she was privileged not to testify against him under Evidence Code section 971.[3] He also asserted the exception to the spousal privilege found in Evidence Code section 972, subdivision (e)(1), concerning when the defendant commits a crime against a cohabitant, does not apply. The trial court admitted Corinne's testimony.

---

*See footnote, *ante*, page 770.

[3]"Except as otherwise provided by statute, a married person whose spouse is a party to a proceeding has a privilege not to be called as a witness by an adverse party to that proceeding

On appeal, the defendant contends the trial court erred in admitting the evidence because he was not a cohabitant of the victims. His argument does not clearly state, however, what definition of "cohabitant" we should adopt. Instead, he argues the defendant's relationship with the victims was too distant to apply the term "cohabitant." His argument lacks merit.

Evidence Code section 972, subdivision (e)(1) provides for an exception to the privilege not to testify against a spouse when the spouse is charged with "[a] crime against the person . . . of the . . . cohabitant of either . . . ."[4] "Cohabitant" should be construed broadly because "[i]ndividuals are uniquely vulnerable in their domestic environment." (*People* v. *Siravo* (1993) 17 Cal.App.4th 555, 562 [21 Cal.Rptr.2d 350].)

In *Siravo*, the defendant was separated from his wife when he sexually assaulted his wife's female housemate. On appeal, the defendant claimed the trial court improperly denied his wife's assertion of the privilege not to testify against him. However, the appellate court rejected that contention. It held the plain meaning of "cohabitant" was "someone who lives together with another." (17 Cal.App.4th at p. 561.)

The defendant was a cohabitant of the Bromleys. He lived in the Bromleys' two-story home under an arrangement with the Bromleys to help take care of the house and the yard. While the defendant did not use the upstairs portion of the house, where the Bromleys' bedroom was located, he occupied a bedroom downstairs and shared the kitchen and other living areas downstairs with them.

The defendant cites *Dunn* v. *Superior Court* (1993) 21 Cal.App.4th 721 [26 Cal.Rptr.2d 365], which, he asserts, criticizes the definition of "cohabitant" in *Siravo*, although he admits the asserted criticism is dictum. While the dictum in *Dunn* criticizes some of the *Siravo* court's reasoning, it does not disagree about the definition of "cohabitant." (*Dunn, supra,* 21 Cal.App.4th at pp. 726-728.) Thus, *Dunn* does not help the defendant here.

In essence, the defendant seeks to amend Evidence Code section 972, subdivision (e)(1) by limiting the situations in which the term "cohabitant"

---

without the prior express consent of the spouse having the privilege under this section unless the party calling the spouse does so in good faith without knowledge of the marital relationship." (Evid. Code, § 971.)

[4]"A married person does not have a privilege under this article in:

". . . . . . . . . . . . . . . . . . . . . . . . .

"(e) A criminal proceeding in which one spouse is charged with:

"(1) A crime against the person or property of the other spouse or of a child, parent, relative, or cohabitant of either, whether committed before or during marriage." (Evid. Code, § 972, subd. (e)(1).)

applies. However, he neither defines those limitations nor demonstrates a legislative intent to impose limitations, which, in any event, would not be relevant because the statute is unambiguous on its face. (*Freedom Newspapers, Inc.* v. *Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826 [25 Cal.Rptr.2d 148, 863 P.2d 218] [best indication of legislative intent is statute's language].) Moreover, there is no indication in the legislative history or in the statute that the Legislature envisioned an inquiry into the nature of the relationship between the people living together. Instead, the broad definition adopted by the *Siravo* court is workable, reasonable, and compelled by the express language of the statute. The trial court did not err.

The defendant also argues Corinne's testimony should have been excluded under the confidential marital communications privilege. (Evid. Code, § 980.)[5] He acknowledges he did not object to Corinne's testimony on this ground in the trial court (*People* v. *Morris* (1991) 53 Cal.3d 152, 187-188 [279 Cal.Rptr.2d 720, 807 P.2d 949]), but he contends he was denied effective assistance of counsel because of the failure to object on this ground.

The defendant is entitled to "reasonably effective assistance." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052].) To prove ineffective assistance of counsel, the defendant bears the burden of showing (1) counsel's representation fell below that expected of a reasonably competent attorney and (2) the incompetence resulted in withdrawal of a potentially meritorious defense. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) On review, we presume the attorney performed reasonably and avoid relying on hindsight to judge the actions of the attorney. (*Strickland, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at pp. 694-695].)

Corinne testified (1) she and the defendant briefly discussed the fact the victims had money but neither worked, concluding they were either independently wealthy or had another source of income and (2) the defendant sent her two $100 bills the same week the murders were committed. The questioning concerning the $100 bills took up most of Corinne's direct examination. In addition, the prosecution introduced the suicide note found in the trash can, which note contains a salutation to Corinne.

The defendant concedes the confidential marital communications privilege could not be used to exclude the two $100 bills or the fact he sent them to

[5]"Subject to Section 912 and except as otherwise provided in this article, a spouse (or his guardian or conservator when he has a guardian or conservator), whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife." (Evid. Code, § 980.)

Corinne. Instead, he contends the evidence of their discussion concerning the victims' source of money and the suicide note would have been excluded by a proper objection and, therefore, he suffered prejudice.

Other than referring to Evidence Code section 980, the defendant makes no attempt to support authoritatively his assertion the suicide note could have been excluded. However, it was never communicated to Corinne in a confidential manner. The defendant testified, although he first intended to give Corinne the note, when he finished it he tore it up and threw it in the trash, not intending to send it to Corinne. In his words, it was "a little self therapy thing." The section 980 privilege did not attach because the defendant never communicated the note to Corinne.

That leaves the discussion between the defendant and Corinne concerning the source of the victims' money. In the overall picture, the effect of this evidence on the jury's determination of guilt would have been minimal. It is not reasonably probable the jury verdict was affected by this evidence. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839]; *Strickland* v. *Washington, supra,* 466 U.S. at p. 687 [80 L.Ed.2d at p. 693].) Since there could have been no prejudice, we need not decide whether a reasonably competent attorney would have asserted the confidential marital communications privilege.

V

*Cumulative Prejudice**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

DISPOSITION

The judgment is affirmed.

Davis, Acting P. J., and Raye, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 21, 1996.

---

*See footnote, *ante,* page 770.