Filed 8/14/20  In re A.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | C089813 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY, AND ADULT SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.C.,<br><br>Defendant and Appellant. | (Super. Ct. Nos. JD239648 & JD238066) |

A.C., mother of the minor (mother), appeals from the juvenile court's order exercising jurisdiction over the minor, removing the minor and placing her outside the home, and providing reunification services to mother.  (Welf. & Inst. Code, §§ 300, 358, 395.)[1]  Finding no merit in mother's claims, we will affirm the juvenile court's orders.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

1

FACTUAL AND PROCEDURAL BACKGROUND

Following the well-established rule of appellate review, we recite the facts in the light most favorable to the judgment. (*People v. Bogle* (1995) 41 Cal.App.4th 770, 775; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

The one-year-old minor came to the attention of the Sacramento County Department of Child, Family, and Adult Services (Department), Child Protective Services (CPS), in January 2019 when mother self-reported that she had not eaten in three days and she reportedly failed to provide food, diapers, or appropriate clothing for the minor, failed to seek medical care for the minor, and allowed someone she knew was an inappropriate caretaker to care for the minor.

On January 30, 2019, Social Worker Lisa Wong made an unannounced visit to mother's home. Wong was greeted by the maternal grandmother (grandmother), who stated mother was not home and noted she watched the minor when mother was working or at school. Wong observed the minor to have reddish, watery eyes and a thick discharge running from her nose.

Wong spoke with mother by telephone that evening. She mentioned her concerns about the minor's health to mother, who said the minor was sick and just teething. Wong encouraged mother to take the minor to urgent care. Mother strongly objected at first, but eventually agreed and took the minor to urgent care. The minor was later diagnosed as having congestion and a viral nasal sinus infection, and mother was given a prescription for the minor's fever and instructed to procure a humidifier and use a nasal bulb to treat the minor.

On February 5, 2019, the minor was assessed by a public health nurse who found the minor to be very congested. The nurse reported mother was not seeking medical care for the minor when necessary and had not scheduled any follow-up care.

On February 13, 2019, during another unannounced visit to mother's home, Social Worker Wong noted the sleeping area for mother and the minor was a full-sized bed in

the middle of the bedroom with a running portable electric heater perched on a chair within reach of the child and the bedding. Mother changed the minor's diaper, leaving her with just one unused diaper in addition to the package of diapers provided by the social worker. There was no milk and no baby bottles containing milk in the refrigerator, and mother had only a box of potato flakes for the minor. The minor had no shoes or clothing appropriate for the weather despite that mother received income from mother's foster care program that included mother's monthly rent plus a monthly stipend and baby supplement. Mother did not have a humidifier or nasal bulb as instructed by the urgent care doctor, and the minor was observed to have a cough.

Wong offered to place the minor in a protective emergency placement, but mother declined. Mother had been a foster child herself and was receiving financial assistance through the AB12 extended foster care program.[2] Wong attempted to discuss the potential of emergency protective placement of the minor and meeting with her AB12 social worker, but mother became agitated, running into the room while holding the minor and stating, " 'You're not going to take my baby, you're not going to take my baby, that's what you want to do all along.' " At the same time, mother was making telephone calls to unknown individuals. When several unknown people entered the apartment, Wong placed the minor into protective custody with the assistance of law enforcement officers. The minor was later diagnosed with croup and severe diaper rash.

The Department learned of a related dependency case involving mother's other child and the minor's sibling, J.C., who had previously been removed from mother's custody after mother left him in the care of the maternal uncle (who had criminal charges pending) and grandmother (who lost parental rights to all of her own children due to a

---

[2]     "AB 12" is an abbreviation for Assembly Bill No. 12 (2009-2010 Reg. Sess.), a commonly used shorthand description of the California Fostering Connections to Success Act enacted in 2010 (Stats. 2010, ch. 559).

3

history of substance abuse). In that case, the juvenile court sustained allegations pursuant to section 300, subdivision (b) in July 2017 and asserted jurisdiction over J.C. Mother was provided reunification services but did not make substantive progress. Mother reportedly told the court, in December 2018, that grandmother was continuing to use drugs.[3] Mother's parental rights to J.C. were terminated on October 24, 2019.[4]

### *Original Dependency Petition*

On February 15, 2019, the Department filed a dependency petition pursuant to section 300, subdivisions (b) and (j) alleging willful or negligent failure of mother to provide the minor with adequate food, clothing, shelter, and medical treatment, and abuse of the minor's sibling, J.C., pursuant to the related dependency case.

On February 22, 2019, the court ordered the minor detained in out-of-home placement, reunification services to mother, and supervised visitation.

### *Jurisdiction/Disposition Report*

The Department filed a jurisdiction/disposition report on March 12, 2019. The report noted concerns about mother's ability to provide the minor with adequate care, supervision, and safety given mother's failure to provide necessary medical follow-up or seek medical treatment for the minor, her unwillingness to exercise preventative, urgent, and follow-up medical care, and her lack of appropriate food supplies necessary to sustain the minor.

During a February 25, 2019 interview by Court Investigator Staci Moreno, mother claimed she was " 'just messing around' " when she told a mandated reporter she had not

---

[3] This statement in the detention report was denied by mother and later clarified by the reporting social worker, who testified mother said she was aware grandmother had a substance abuse problem.

[4] On March 15, 2019, the case was joined with the related case regarding the minor's sibling, J.C. We take judicial notice of this court's related case No. C090837 regarding J.C.

4

eaten in three days. Mother claimed she was cooking and cleaning the kitchen when Wong arrived at her home. She reported her previous foster parent had provided her with chicken that she was preparing, along with mac and cheese and mashed potatoes, when Wong arrived. Mother stated she was " 'running low on everything [food],' " but she had food and a half gallon of milk for the minor. Mother also claimed she had an unopened package of 30 diapers in the bedroom but Wong " 'didn't want to see that' " and " 'brought me the wrong size diapers anyways.' "

When asked whether she utilized public resources, mother said she visited the food bank " 'here and there' " but did not like to use public transportation with the minor. Mother also said she called permanency Social Worker Melissa Byrd to inquire about assistance with food but was told Byrd would " 'get back to [mother].' " Mother explained her previous foster parent provided her with food when needed. She added she had not received her AB12 check so she was low on supplies.

Mother denied the electric space heater in the bedroom was on when the minor was sleeping and claimed it was placed on the floor, not on a folding chair as reported by the social worker. Mother stated she had a playpen set up in the bedroom at the time of Wong's visit, and she had appropriate clothing and shoes for the minor, as well as a car seat and a stroller.

Mother confirmed she left the minor in the care of grandmother because the former foster mother, who typically watched the minor, was unavailable the day Wong visited. Mother claimed January 30, 2019, was the first time grandmother watched the minor. She denied reporting grandmother was abusing substances, and insisted grandmother was an appropriate caregiver and she did not see any issue with grandmother providing care to the minor.

Mother reported she quit her job approximately three weeks prior because she was " 'too stressed' " with the current case. She received $350 per month through the AB12

5

program that also paid her rent in full. She stated she had an appointment with CalFresh on February 26, 2019.

Moreno reported her belief that grandmother was living with mother based on grandmother's post on social media stating she was "no longer homeless and can 'happily say I . . . have a home to go to thanks to the special young lady in my life my daughter I love you see you soon.' " Moreno also spoke with mother's former foster parent, T.G., who reported mother called on February 1, 2019, asking for help filling the minor's prescriptions and providing food and asked for help with childcare while mother attended school. The first week of February 2019, T.G. picked up and paid for the minor's prescription, " 'filled' " mother's freezer and cabinets with food, purchased a playpen and helped mother set it up in mother's bedroom. T.G. also provided childcare from February 4, 2019, until the minor was placed in protective custody.

Mother's AB12 social worker, Nena Marlin, stated she met with mother and the minor on January 17, 2019, after mother had been " 'evading' " Marlin for three weeks, and again on February 13, 2019. She offered mother food bank services after mother stated she was " 'running low' " on food and size-five diapers. However, mother refused the food bank services, telling Marlin she " 'doesn't eat those kinds of foods.' " When Marlin met with mother on February 13, 2019, and explained mother was being " 'fined' " for missing her face-to-face meeting, mother became agitated and aggressive. Marlin noted there were dishes in mother's sink and food cooking on the stove.

Mother's landlord reported on March 6, 2019, that someone broke into mother's apartment, tossing things around and causing the kitchen sink to overflow. Marlin met mother and several of her friends at the apartment. T.G. and grandmother were also there. Mother stated she knew the person who had taken her extra key the prior week and she " 'expected something like this to happen.' " Marlin later reported she had concerns that grandmother was living in mother's home when Marlin heard grandmother say she

6

" "had to get her stuff' " from mother's apartment and then rummaged through bins of " 'random stuff' " she said belonged to her.

The Department recommended the court sustain the petition as amended to allege additional facts regarding the subdivision (b) allegation, add allegations pursuant to subdivision (j) regarding mother's failure to provide adequate care, supervision, and protection to the minor's sibling, J.C., and strike the allegations regarding mother's failure to provide adequate medical care for the minor.

### *Addendum Reports*

The addendum report filed March 25, 2019, discussed assessment of and possible placement of the minor with mother's former foster mother, T.G., and other nonrelated extended family members. T.G. was reportedly assessed but placement was not recommended due to her CPS history and recent referrals regarding T.G.'s inappropriate actions and threats toward mother.

The report noted a Child and Family Team meeting was held on March 25, 2019, with mother, T.G., several social workers, and other staff present to discuss what needed to be done to return the minor to mother's care.

According to another addendum report filed May 1, 2019, Social Worker Melissa Byrd reported mother had yet to engage in services in the minor's case and had not consistently engaged in services in the sibling's case. Byrd submitted a referral for individual counseling and a psychotropic medication evaluation with Strategies for Change but mother had not yet made an appointment. Byrd met with mother to help her make the telephone call for a counseling appointment and mother left a voicemail for Strategies for Change. However, mother had not yet engaged in counseling or completed a medication evaluation. Mother also did not attend her appointment for a parenting class and did not return telephone calls from Alta Regional Services regarding services for the minor.

The report set forth details about mother's involvement in an auto accident in the early morning hours of April 10, 2019, which resulted in the death of two of mother's friends and left another friend in critical condition. Mother was the only occupant who escaped serious injury and was released from the hospital with a concussion.

The report also stated mother completed a psychological evaluation with Dr. Jayson Wilkenfield on March 14, 2019, in relation to the sibling's dependency case. Dr. Wilkenfield reported that, while he found no information mother had "ever behaved in an abusive manner toward either of her children or that either of them has ever been a victim of chronic neglect while in her care, notable concerns remain as to whether she possesses the insight, the facility for exercising appropriate practical judgement, the degree of social and emotional maturity and/or the psychological (including intellectual) resources that are considered necessary for making decisions that are in her children's best interests and for managing the responsibilities associated with providing for their safety, needs and welfare independently on a consistent basis." Dr. Wilkenfield stated these concerns led to a "guarded prognosis for her ability to benefit from any services the Department could offer her at this point sufficiently that her children could be returned to her care by the time she has participated in six more months of services without this putting the minors back in a situation in which they would continue to be at an elevated risk for neglect and/or harm."

Based on mother's failure to make substantial progress in the sibling's case and the findings set forth in Dr. Wilkenfield's report, the Department concluded mother would not benefit from services and recommended the court sustain the amended petition, continue the minor in out-of-home placement, and bypass mother for reunification services pursuant to section 361.5, subdivision (b)(10).

### *First Amended Dependency Petition*

The Department filed a first amended dependency petition that alleged mother failed to provide adequate care, support, and protection for the minor pursuant to section

8

300, subdivision (b), due to mother's failure to provide adequate food, clothing, or diapers for the minor, and her failure to make arrangements to obtain food or to access resources for the minor. It was further alleged mother failed to provide adequate supervision and protection for the minor pursuant to section 300, subdivision (b), by leaving the minor with the grandmother who had lost her parental rights to all of her own children due to a history of drug use. Finally, the amended petition alleged abuse of the minor's sibling, J.C., pursuant to section 300, subdivision (j), based on the related dependency action in which mother failed to provide adequate care, supervision, and protection by leaving J.C. with the grandmother.

### Contested Jurisdiction/Disposition Hearing

The contested jurisdiction/disposition hearing was held over three days in May 2019.

### Social Worker's Testimony

Social Worker Lisa Wong testified she received a referral from a mandated reporter on January 23, 2019, that the minor was at risk of harm and grandmother was still using drugs. She went to mother's home on January 30, 2019, and found the minor in the care of grandmother. Wong had concerns about the minor's health, which she discussed with staff, but the minor was not removed from the home at that time.

Wong further testified that, on February 13, 2019, she received another referral from a mandated reporter that mother claimed not to have eaten for three days and to have no food or diapers for the minor. When Wong arrived at mother's apartment at approximately 6:00 p.m. on February 13, 2019, she observed half of a watermelon and a package of discolored meat in the refrigerator, both of which were spoiled. Mother informed her she had two containers of apple sauce for the minor in the freezer but when Wong looked in the freezer, she did not find them. Mother also told Wong she had been feeding the minor flaked mashed potatoes but no longer wanted to give those to the minor. There was no other food in the kitchen and mother was not cooking anything on

9

the stove. Other than a bottle of "milk-like substance" mother retrieved from the sofa, Wong did not see any milk in the home. When Wong asked mother whether she had any more food, mother replied, "No," and was unable to provide a plan as to how she would obtain additional food.

Wong testified that mother had only two clean diapers. Wong watched mother change the minor, leaving just one clean diaper in addition to the box of diapers Wong brought with her from the CPS office. Wong did not see an additional unopened pack of diapers in the bedroom as mother claimed.

Wong further testified that the weather was cold and rainy when she arrived at mother's apartment. The minor was wearing only a diaper and a shirt. When Wong asked mother whether she had any other clothing for the minor, mother did not respond and provided only a small receiving blanket that did not cover the minor. Wong walked through mother's apartment and did not see a crib, a playpen, or a car seat.

Wong stated she told mother, "We want to give you the opportunity to have the [minor] safe and allow [you to] get your financial state in order." She tried to engage mother in a discussion about whether there were any relatives with whom to place the minor, but mother was making multiple calls on her phone and became inconsolable. When five unknown individuals appeared at the apartment and began talking with mother, Wong called her supervisor to discuss the situation and then called law enforcement authorities for assistance. The officers attempted to talk with mother, but she became very upset and said repeatedly, "They're trying to take my baby. They're trying to take my baby." Wong noted she gave mother approximately three hours to calm down, but then eventually took the minor into protective custody due to the lack of provisions, including food and diapers.

### Mother's Testimony

Mother testified Wong showed up at her apartment unannounced and asked if she could see the minor, who was sleeping on the bed. Mother claimed that when Wong

asked if she had any food, mother showed Wong what was in the refrigerator -- hot dogs, macaroni and cheese, mashed potatoes, and lasagna.  Mother confirmed Wong brought her diapers but they were the wrong size.

Mother testified that, during Wong's visit, there was food in the refrigerator and there were diapers in the closet.  She then claimed her friends brought her food that was in the car, but she did not tell Wong because Wong would not let her talk and "just up and took my baby."  She claimed she told Wong there was food in the car, but Wong did not care about the food and would not allow her to retrieve it.  Mother also claimed her friends brought her "[j]uice, lunch meat, hot dogs, chicken, hamburgers, pizza rolls, mashed potatoes, mac and cheese, lasagna," and she was going to feed the 11-month-old minor the same thing she ate.  Mother identified, as part of her support group, her former foster mother T.G., who took her shopping and purchased food, clothes, baby wipes, and diapers for her.

Mother confirmed she reached out to Social Worker Byrd for help with food and diapers but denied calling the emergency hotline and reporting she had no food, she had not eaten in three days, or the minor was out of diapers.  She denied the watermelon in her refrigerator was old.  She explained she paid for groceries and supplies for the minor with the $350 provided monthly through the AB12 program that also paid her monthly rent.  She also received $190 per month in CalFresh benefits.  It was mother's understanding she would receive increased benefits if both the minor and J.C. were returned to her care.  She confirmed she was using most of the money she received from the AB12 program to pay an outstanding utility bill.

Mother testified she was 12 years old when she first learned about grandmother's substance abuse history.  She knew grandmother used marijuana and methamphetamine.  She was also aware grandmother's parental rights were terminated because grandmother failed to address the drug problem, but she did not know whether grandmother had participated in or completed any drug treatment program or had drug tested since that

11

time. She has never seen grandmother show any symptoms of being under the influence of marijuana or methamphetamine, but she admitted it was possible grandmother had been under the influence in her presence. However, mother denied telling the social worker that grandmother was still using drugs. She claimed she knew grandmother was not using drugs because she could "tell when somebody's under the influence of a drug." She also claimed grandmother only watched the minor "that one time." Mother admitted Social Worker Byrd offered her Child Action for child care, but denied she refused that service.

Mother claimed she had clothing and several pairs of shoes for the minor, which she kept in the bedroom closet. When asked who broke into and damaged her apartment, mother begrudgingly identified the individual as someone named Isaiah whom she knew from school and had invited over for a small gathering of her friends. She stated she and Isaiah had an argument and she told Isaiah he could not come back to her apartment.

Mother further testified she quit her job in February 2019 because there was a "lot of drama and nitpicking going on, so I had to remove myself from the situation."

Mother testified the qualities she looked for in someone to watch her children included having "a clean background of no substance use or no criminal record," adding that someone with a history of drug use, criminal activity, or CPS involvement "would be an inappropriate caregiver" to watch the children. When asked why she left the minor with grandmother who had a CPS history, mother explained she had to get to work and grandmother "was the closest person for me to call." When asked what she could do differently in that situation, mother said she could call her other resources first before calling a family member or let work or school know she was unable to attend.

### Court Investigator's Testimony

Court Investigator Staci Moreno testified she had no personal knowledge regarding whether grandmother was currently abusing illegal substances or what provisions mother currently had for the minor. She testified that lack of food had been an

ongoing issue for mother. Food bank services were offered to mother, but she declined because she did not like the food that was being offered. When asked if her concerns would be alleviated if mother had food in the home, Moreno responded, "No. [¶] . . . [¶] . . . Because she can run out of food at any point in time." Moreno also testified she spoke with Social Worker Marlin, who reported the Department decreased mother's funding by the amount of the outstanding utility bill and the new phone mother purchased.

### Social Worker's Testimony

Social Worker Melissa Byrd testified that mother did not complete her case plan services in the case involving the minor's sibling, J.C., nor had mother completed her current case plan involving the minor. In particular, mother had yet to complete her psychotropic medication evaluation, meet with her parent advocate, or finish individual counseling. Byrd also clarified that mother said she was aware grandmother had a substance abuse problem, not that grandmother was using drugs.

### Juvenile Court Ruling

The court found the evidence supported its exercise of jurisdiction over the minor. In doing so, the court first noted it did not find mother's testimony to be at all credible, noting her testimony was "riddled with inconsistencies such that it seemed at some points that she was making it up as she went." The court went on to find "mother's environment is completely unstable," as evidenced by the fact that mother left her job in February 2019 due to "interpersonal drama," that same month the police were called when two men were fighting in her apartment, her apartment was broken into in March 2019 by a person who previously attended a party there, mother had to move a visit due to a dispute she had with individuals who frequented the location of the visits, and in April 2019 mother was involved in a serious traffic accident in the middle of the night in which occupants of the car were either killed or seriously injured. The court further found mother failed to benefit from services she completed, as evidenced by the fact she was

13

unable to provide basic provisions for the minor and continued to allow grandmother to continue to care for the minor, despite having previously lost custody of the minor's sibling, J.C., because she elected to place J.C. in grandmother's care.

With regard to whether there was a current risk of detriment, the court found mother knew grandmother was an inappropriate caregiver based on J.C.'s dependency case. The court stated, "[t]his was not a one-time incident," noting grandmother was living in mother's apartment and had admitted she watched the minor when mother was at work or school. The court also noted grandmother had her parental rights terminated as to mother due to "relatively frequent and severe" drug use, she was homeless and no longer living in a sober living environment, she was staying in mother's apartment, and mother had no idea whether grandmother had obtained drug treatment or was actively drug testing. The court further found mother's willingness to leave the minor in grandmother's care despite having lost custody of J.C. for doing so suggested mother was likely to continue using inappropriate caregivers in the future, and thus return of the minor to mother would create a substantial risk of detriment.

The court also found a current risk of detriment due to past incidents when mother told others she was running low on food and needed help but refused food bank services. Acknowledging mother now had access to CalFresh benefits, the court noted mother had, in the past, used some of her AB12 benefits to pay off an expensive utility bill and purchase a new phone, "all of which indicates an ongoing concern with mother's ability to provide sufficient food and resources."

The court sustained the allegations in the amended petition, adopted the Department's recommended findings and orders contained in the March 12, 2019 jurisdiction report, and scheduled a disposition hearing.

### *Addendum Report*

The Department filed a June 14, 2019, addendum report providing updated information on mother's progress in services. Social Worker Byrd reported that, two

14

weeks after the contested jurisdiction hearing, she informed mother the counselor at Strategies for Change would be in contact with mother to schedule an intake appointment. However, mother stated she was not interested in participating in services through Strategies for Change as she was already engaged in services through Turning Point, an agency not contracted with the Department. As of the date of the hearing, Byrd had yet to receive confirmation from Turning Point that they would be able to provide quarterly reports on mother's progress.

Byrd also reported Alta Regional Services attempted to assess the minor, but mother declined to give her consent for such services because she did not feel the minor needed them.

The Department concluded mother was not meeting the minor's developmental needs and recommended the minor remain in out-of-home care while mother participated in additional reunification services, noting there was no evidence any of the bypass provisions set forth in section 361.5, subdivision (b) applied. The Department based its recommendation on the following: mother's reunification services in J.C.'s dependency case were terminated after approximately two years of services due to mother's failure to make substantial progress; despite those two years of services, mother left the minor with grandmother, who has a documented history of drug abuse that "has not been proven to have been ameliorated and has resulted in the loss of parental rights" to all of her own children; and, since the inception of the case, mother had "dangerous activity in her home," including the March 2019 break-in and the April 2019 assault on mother that resulted in a visit to the hospital. The Department also recommended mother receive an additional six months of services to include: individual counseling; participation in dialectical behavior group therapy; independent living skills instruction; referral to Alta Regional Services to determine mother's eligibility for services to improve her parenting skills and broaden her understanding of issues related to parental responsibility; anger management classes; additional parenting classes focused on issues related to child safety

15

in the home; and a psychiatric medication evaluation to determine the appropriateness of antidepressant medication to address mother's " 'low-grade' " depression.

### *Disposition Hearing*

At the June 14, 2019, disposition hearing, the court adopted the Department's recommended findings and ordered continued out-of-home placement for the minor and additional reunification services for mother.

### DISCUSSION

### I

### *Substantial Evidence for Dependency Jurisdiction*

Mother contends there was insufficient evidence to support the court's exercise of jurisdiction over the minor. She claims circumstances had changed significantly such that any issues present when the minor was placed in protective custody were resolved by the time of the jurisdictional hearing. As we shall explain, sufficient evidence supports the court's jurisdiction order.

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re Basilio T.* (1992) 4 Cal.App.4th 155, 170.) " 'If there is any substantial evidence to support the [jurisdictional] findings of the juvenile court, a reviewing court must uphold the trial court's findings. All reasonable inferences must be in support of the findings and the record must be viewed in the light most favorable to the juvenile court's order. [Citation.]' " (*Id*. at p. 168.) "[I]ssues of fact and credibility are the province of the trial court. [Citation.]" (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) If supported by substantial evidence, the judgment or finding must be upheld, even though substantial evidence may also exist that would support a contrary judgment and the dependency court might have reached a different

16

conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

The amended petition alleged mother's failure to provide adequate care and support due to having inadequate food, clothing, and diapers for the minor, and her failure to provide adequate supervision and protection by leaving the minor with the grandmother, an inappropriate caretaker, pursuant to section 300, subdivision (b). The petition also alleged abuse of the minor's sibling, J.C., pursuant to section 300, subdivision (j), in that J.C. was adjudged a dependent of the juvenile court on July 14, 2017, due in part to mother's failure to provide adequate care, supervision, and protection by leaving J.C. with the grandmother.

Mother argues there was insufficient evidence to support the court's exercise of jurisdiction under section 300, subdivision (b). However, " '[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Here, we conclude there was sufficient evidence to support the jurisdictional finding pursuant to subdivision (j) of section 300. Therefore, we need not consider whether the other alleged statutory grounds for jurisdiction (i.e., the subdivision (b) allegations) were supported by the evidence. (*In re I.J., supra*, 56 Cal.4th at p. 773.)

Subdivision (j) applies if (1) the child's sibling has been abused or neglected as defined in specified other subdivisions of section 300, and (2) there is a substantial risk the child will be abused or neglected as defined in those subdivisions. (§ 300, subd. (j).) Both requirements were met.

17

As to the first requirement, the juvenile court took judicial notice of reports in the related dependency case of the minor's sibling, J.C., wherein dependency jurisdiction was asserted over J.C. based in part on allegations that mother left J.C. in the care of the maternal uncle who had criminal charges pending against him, and the grandmother who lost her parental rights to her own children due to a history of substance abuse. The juvenile court in J.C.'s case determined, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of . . . his parent . . . to adequately supervise or protect the child, or the willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . ." (§ 300, subd. (b)(1).)

To determine whether the second requirement was met, subdivision (j) includes a list of factors for the court to consider, including "the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).) Subdivision (j) " 'accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' [Citation.]" (*In re I.J., supra*, 56 Cal.4th at p. 774.)

The court found the minor was at substantial risk of abuse or neglect due to the fact mother left the minor in the care of grandmother. In that regard, the court did not find credible mother's claim she left the minor with grandmother only once and instead found it was likely grandmother lived with mother and cared for the minor regularly. Substantial evidence supports the court's finding. As the court noted, grandmother admitted she watched the minor when mother was at work or school. There was evidence

18

grandmother lived with mother based on grandmother's social media post and the grandmother getting her " 'stuff' " from inside the apartment after the break-in.

The court found mother knew grandmother was an inappropriate caregiver as a result of J.C.'s dependency case, yet she continued to place the minor in grandmother's care and was likely to continue to do so, placing the minor at risk of abuse or neglect. As the court noted, the jurisdiction/disposition report in J.C.'s case stated grandmother lost parental rights to all of her own children as a result of her ongoing substance abuse of amphetamine and marijuana. Thereafter, grandmother reportedly failed to complete informal services including alcohol and drug abuse counseling and failed to refrain from using drugs and alcohol. Grandmother was no longer living in a sober living environment and, while there was no evidence of grandmother's current use of drugs, mother testified she had no idea whether grandmother ever participated in or completed any substance abuse treatment or had participated in any sort of drug testing since having her parental rights terminated. Based on the evidence, there was a substantial risk the minor would be abused or neglected for purposes of section 300, subdivision (j). "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

Mother attempts to distinguish grandmother's care of the minor in the current case from grandmother's care of the minor's sibling in J.C.'s dependency case, arguing the latter involved mother "leaving her eldest child with the maternal uncle for an unspecified extended period, during which the grandmother provided care when he was at work" and the former involved mother "caring for the minor herself but requir[ing] child care" by grandmother. Mother's argument misses the point entirely. The court in J.C.'s dependency case removed J.C. from mother due in part to the fact she left J.C. in the care of grandmother, who had a history of substance abuse that resulted in the loss of her own parental rights. The same was true in this case. Knowing J.C. was removed

19

because he was placed in grandmother's care, mother nonetheless continued to use grandmother as a caregiver for the minor.

We conclude substantial evidence supported the juvenile court's assertion of jurisdiction over the minor pursuant to section 300, subdivision (j).

## II

### *Substantial Evidence for Removal*

Mother contends there was insufficient evidence to support the court's order removing the minor from her custody. Not so.

To support an order removing a child from parental custody, the court must find clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); see *In re Heather A., supra*, 52 Cal.App.4th at p. 193; *In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) The court also must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) Removal findings are reviewed under the substantial evidence test, drawing all reasonable inferences to support the findings and noting that issues of credibility are matters for the trial court. (*Heather A.,* at p. 193.)

"A removal order is proper if it is based on proof of (1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]" (*In re T.W., supra*, 214 Cal.App.4th at p. 1163.)

At the outset, we reject mother's claim that the court failed to specify facts to support its conclusion removal was necessary. When the court ordered continued out-of-

20

home placement of the minor, it adopted the recommended findings and orders contained in the Department's addendum report that included a finding that there was a substantial danger to the minor if returned to mother and no reasonable means by which to otherwise protect the minor.

Additionally, the court stated its decision was based on the "reasons stated on the record in my decision in jurisdiction." In its jurisdictional ruling, the court found removal was necessary and appropriate for several reasons. First, the court found mother's environment was "completely unstable" and she consistently "put[] herself in situations that put her at risk," a trait of mother's identified in her psychological evaluation. The court further found mother had not benefitted from the services she completed, as demonstrated by the fact she was unable to provide basic necessities such as food, clothing, and diapers for the minor, and she chose to leave the minor with grandmother despite the fact mother previously lost custody of the minor's sibling, J.C., for doing so. " 'The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. [Citation.]' [Citation.]" (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

Regarding the risk of detriment, the court found mother's decision to leave the minor in grandmother's care "was not a one-time incident," and her willingness to leave the minor with grandmother despite having her other child removed for doing so suggested mother was likely to continue to do so in the future. Despite mother's testimony that she felt someone with a history of drug use or CPS involvement "would be an inappropriate caregiver" for the minor, mother left the minor with grandmother, who had a history of drug abuse and CPS involvement. When asked why she did so, mother simply said she had to get to work and grandmother "was the closest person for me to call." The court also found a current risk of detriment based on mother's prior refusal of resources after requesting help.

21

Mother argues the Department failed to identify reasonable efforts to prevent removal. We disagree. The Department provided mother with resources such as the food bank and Child Action, but mother refused those services. It is clear that her poor judgment was not allowing her to make good choices for her child. The Department attempted to identify, locate, and assess relatives and nonrelated extended family members for placement. In particular, mother's former foster parent, T.G., was assessed but not recommended for placement due to her CPS history and recent referrals regarding T.G.'s inappropriate actions and threats toward mother. Mother's refusal to utilize services offered to her, the likelihood she would continue to place the minor with an inappropriate caretaker, and her lack of engagement in key services in the present case as well as J.C.'s dependency case all supported removal.

Mother also argues that, by the time of the disposition hearing, circumstances had changed significantly such that any issues were sufficiently remedied to ameliorate any risk to the minor. In that regard, she argues she obtained additional support for food through CalFresh and arranged for child care with her former foster mother. She claims the evidence of danger to the minor amounted to nothing more than " 'concerns' " about "possible future circumstances" such as mother's ability to provide food and diapers and the possibility she would leave the minor in the care of an inappropriate caregiver. Mother's arguments are unpersuasive. Mother's inability to provide adequate food and diapers for the minor despite available services and resources was an on-going issue. While mother points to her own testimony as evidence that she arranged for childcare with her former foster mother, the record does not support her claim. In any event, the concern that mother would leave the minor with an inappropriate caretaker was well founded given her choice to leave the minor with the grandmother after the removal of J.C. for doing so. It is clear that mother was exhibiting an ongoing pattern of extremely poor judgment and lack of insight regarding the health and safety of the minor in nearly all areas of the minor's care.

22

Finally, mother argues reasonable means to protect the minor existed prior to and at the time of the disposition hearing, claiming the Department failed to assist her in obtaining CalFresh earlier, failed to find her reasonable childcare, and failed to consider the option of mother moving back into the home of her former foster parent, T.G. Again, we are not persuaded. As previously discussed, the court took into consideration the fact mother would receive additional financial assistance through CalFresh but determined that did not alleviate the ongoing concerns about mother's ability to provide adequate food, diapers, and clothing for the minor. While mother was referred to Child Action for childcare, she demonstrated a pattern of choosing to place the minor with inappropriate caregivers, such as grandmother, and the court expressed its concern she would likely continue to do so, particularly when grandmother was living in her apartment. As for mother's possible return to the home of her former foster parent, the Department assessed T.G. as a possible caregiver for the minor and determined placement was inappropriate due to several recent referrals related to disagreements and threats between T.G. and mother.

We conclude there was sufficient evidence to support the court's removal order.

### III

### *Substantial Evidence of Reasonable Efforts to Prevent Removal*

Mother contends there was insufficient evidence reasonable efforts were made to prevent the removal of the minor. Again, a removal order requires that the court find clear and convincing evidence of a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home" and "no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361,

23

subd. (c)(1).)[5] Section 361, subdivision (e), requires that the court "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based."

Mother argues the record failed to include evidence of the Department's reasonable efforts to prevent or eliminate the need for removal, such as discussions with mother regarding food bank services, CalFresh benefits, or other possible resources for food. The argument borders on frivolous.

As mother properly concedes, we may infer the basis for the juvenile court's determination from the record. (See *In re S.G.* (2003) 112 Cal.App.4th 1254, 1260 [the "pertinent rule of appellate review" is that the appellate court "will infer a necessary finding provided the implicit finding is supported by substantial evidence"]; *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83 [permanency planning order finding implied].) Here, the record is replete with references to the Department's efforts to assist mother, including discussions with mother about the availability of food bank services that she refused to utilize. Social Worker Byrd referred mother to Child Action for childcare, but mother refused that as well. Mother also declined the opportunity to meet with her AB12 social worker, Nena Marlin, to discuss the program requirements in order to continue receiving benefits uninterrupted. Social Worker Wong offered to place the minor in a protective emergency placement, but mother declined and began calling her friends and support people instead. Finally, while mother complains there was no evidence Social Worker Wong brought her any food even though the initial referral noted

---

**5**    Mother erroneously cites section 361, subdivision (d), which addresses the situation where the minor is removed from the custody of a parent "with whom the child *did not* reside at the time the petition was initiated." (Italics added.) That subdivision does not apply here, as the minor was removed from the custody of mother, with whom the minor lived at the time the petition was filed.

24

she needed food and diapers, mother testified she told Wong she already had food provided by her friends -- hot dogs, macaroni and cheese, mashed potatoes, and lasagna -- in the refrigerator.

On this record, it is clear reasonable efforts were made to prevent the removal of the minor.

## IV

### *No Ineffective Assistance of Counsel*

Mother claims she suffered prejudicial ineffective assistance of counsel due to her trial counsel's failure to call two witnesses to testify about the events and circumstances leading up to the minor's removal. We reject the claim.

A claim of ineffective assistance of counsel may be reviewed on direct appeal when there is no satisfactory explanation for trial counsel's act or failure to act. (*In re N.M.* (2008) 161 Cal.App.4th 253, 270.) To prevail on such a claim, mother must demonstrate: "(1) counsel's representation fell below an objective standard of reasonableness; and (2) the deficiency resulted in demonstrable prejudice." (*In re Kristen B.* (2008) 163 Cal.App.4th 1535, 1540.) We must affirm the judgment unless the record "affirmatively establishes counsel had no rational tactical purpose for the challenged act or omission . . . ." (*Id*. at p. 1541.) In addition, we may reject mother's claim if she cannot show it is reasonably probable the result would have been more favorable to her but for trial counsel's alleged failings. (*N.M.,* at p. 270.)

Here, mother failed to demonstrate her trial counsel's representation fell below the requisite standard. She claims AB12 Social Worker Nena Marlin and her former foster parent, T.G., would have corroborated her testimony that she had food, a playpen, and other disputed items on the day of Wong's unannounced visit. However, the statements and opinions of both witnesses were already contained in the Department's reports and referenced in mother's testimony.

Further, we have little difficulty finding mother's attorney may have had a tactical reason for not calling Marlin and T.G. to testify.  While the two witnesses might have expounded on the information contained in the reports, their testimony might also have been detrimental to mother's case.  For instance, Marlin could have testified, as she stated in the reports, that mother evaded her for nearly a month before Marlin was able to meet with her, and mother refused the food bank services Marlin offered her.  Similarly, T.G. would likely have been cross-examined regarding her assessment for placement, and the CPS history and recent referrals regarding inappropriate actions and threats toward mother that resulted in a recommendation not to place the minor with her.  In any event, neither T.G.'s nor Marlin's testimony would have cured the credibility issues with other portions of mother's testimony.

Mother has failed to demonstrate ineffective assistance of counsel.

### DISPOSITION

The juvenile court's orders are affirmed.


        /s/
        HOCH, J.


We concur:


 /s/
DUARTE, Acting P. J.


 /s/
BUTZ, J.*

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.