Filed 4/14/26  P. v. Womack CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DESHON MAURICE WOMACK,<br><br>    Defendant and Appellant. | 2d Crim. No. B335361<br>(Super. Ct. No. BA490998)<br>(Los Angeles County) |

Deshon Maurice Womack appeals from the judgment entered after a jury convicted him of first degree murder and shooting at an occupied motor vehicle.  (Pen. Code, §§ 187; 189, subd. (a), 246.)[1]  The trial court found true allegations that appellant had previously been convicted of three serious felonies within the meaning of section 667, subdivision (a)(1), and three serious or violent felonies within the meaning of California's

_____

[1] Unless otherwise stated, all statutory references are to the Penal Code.

"Three Strikes" law.  (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)  The trial court struck the three prior serious felony convictions within the meaning of section 667, subdivision (a)(1).  It sentenced appellant to prison for 75 years to life: 25 years to life for the first degree murder conviction, tripled pursuant to the "Three Strikes" law.

Appellant contends the trial court erroneously (1) admitted evidence of appellant's and his accomplices' membership in a criminal street gang, as well as evidence of gang culture and customs; (2) denied appellant's motion for new trial based on the alleged misconduct of a juror; and (3) denied appellant's request for an evidentiary hearing at which the juror would be required to testify concerning the misconduct.  We affirm and direct the trial court to correct errors in the abstract of judgment.

*Facts*

The murder was committed during a drive-by shooting.  The shooting and surrounding events were recorded by video surveillance cameras.

The videos showed that at 3:52 p.m. a silver BMW left Jesse Owens Park in the City of Los Angeles.  At 3:57 p.m. the victim's vehicle, a black Mercedes, was heading "northbound on Western Avenue followed moments later" by the silver BMW.  The Mercedes made a U-turn into the southbound lanes on Western Avenue and parked along the curb.

Witnesses described the subsequent events as depicted in the videos: "Moments later the silver BMW . . . also comes southbound" on Western.  Someone in the BMW is lowering the front passenger window.  "[T]he front passenger is wearing a red hoodie."  The BMW "pulled up next to the [parked Mercedes].  A hand appears from the front passenger window.  It appears to be

2

holding a small object . . . -- almost instantaneously to that . . . the right-rear passenger window of the [Mercedes] . . . appears to shatter, and then the silver BMW continues southbound on Western."

"[A] couple of minutes after the shooting," the BMW pulled into a driveway and stopped. Appellant got out of the driver's seat. Appellant's codefendant, Alon Hunt, got out of the rear passenger seat.[2] J.T., a juvenile, got out of the front passenger seat. J.T. was wearing "[a] red hoodie." He appeared to take a "shooting stance." He "put his left foot forward, right foot back, [and] extended his right hand out towards the direction or at the driver's window" of the BMW.[3]

When the police arrived at the scene of the shooting, they "noticed bullet impacts on the driver's side" of the Mercedes. Three .9 millimeter bullet casings were "on the ground next to the driver's side." The only occupant of the vehicle was a man in the driver's seat, later identified as Derald Loadholt. He had a gunshot wound to the left side of his face. An officer tried to speak to Loadholt, but he was nonresponsive. The wound was fatal. It caused "injuries to multiple parts of his brain." There is no evidence that Loadholt was a gang member.

Appellant, Hunt, and J.T. were members of the Rollin' 90's Neighborhood Crips (Rollin' 90's), a criminal street gang. The Rollin' 90's claim territory in Los Angeles. Jesse Owens Park

---

[2] The jury acquitted Hunt.

[3] In an unpublished opinion, this court affirmed the judgment entered after the juvenile court found true an allegation that J.T. had committed first degree murder. (*In re J.T.* (Oct. 18, 2022, B314411) [nonpub. opn.].)

"[is] known as a stronghold of [the] Rollin' 90's." Prior to the shooting, the silver BMW departed from the park.

Another criminal street gang – the Eight Trey Gangster Crips (Eight Trey) – is one of the main rivals of the Rollin' 90's. In gang culture, rival gangs are viewed as "enemies." Gang rivalries can result in "violence[,] shooting[s,] and something as bad as a homicide."

A gang member's reputation is very important. Gang members enhance their reputation by committing acts of violence and "having [] other members from the gang see them do it." By committing acts of violence, a gang member demonstrates that he is "loyal" to the gang, "committed," and "trustworthy." A gang member also enhances his reputation "by helping fellow gang members commit crimes."

It is "common for gang members to commit shootings in groups." "[I]n a group [they are] stronger together." Civilians who witness a group shooting are "more afraid" and therefore "less likely to report the incident to the police."

The shooting of Loadholt occurred in territory claimed by Eight Trey. Committing a murder in a rival gang's territory enhances a gang member's reputation more than any other act of violence. It shows "that he's not only willing to be violent in his territory but he's willing to be violent . . . in enemy territory." It also enhances the entire gang's reputation because news of the "killing [in] enemy territory . . . spreads [and] . . . makes them stronger as a whole . . . [and] more feared" in the community.

After the People had rested, the defense rested without presenting any evidence.

*Trial Court's Admission of Gang Evidence*

The information alleged that appellant had committed the murder for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C). The trial court granted appellant's motion to bifurcate the trial of the gang allegation.[4]

As to the trial by jury on the other charges, the People moved to admit gang evidence relating to appellant, Hunt, and J.T. Appellant moved to exclude all gang-related evidence.

At the hearing on the motions, the prosecutor argued: "If the gang evidence is removed from this case, then it doesn't make any sense why three people would go into . . . a random neighborhood and kill a random person they have no connection with for no apparent reason at all." "So in terms of aspects of the case like motive, intent, premeditation, knowledge, the gang evidence speaks highly to all of that. And to exclude it essentially sanitizes the trial and leaves the jury with a confusing impression."

The trial court granted the People's motion to admit gang evidence. The court reasoned that the "probative value [of the

---

[4] At the bifurcated trial, the court found the gang allegation "not true." The court reasoned: "[I]n summary, I think the prosecution's theory [of the shooting] is a reasonable interpretation. It very well could have been a gang-related incident, or a brazen gang shooting, but there's also an interpretation that there was some other motivation behind the crime; that it could have been a personal vendetta, a personal beef. It could have been simply random. [¶] And so if there are two reasonable interpretations, the court is required to adopt the one that points to innocence. So based upon all of that, the court will find that the gang enhancement hasn't been proven . . . ."

5

gang evidence] exceeds [its] prejudicial [impact]." In support of its ruling, the court read into the record the following excerpt from *People v. Garcia* (2008) 168 Cal.App.4th 261: " 'The People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." [Citation.] "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*Id.* at p. 275.)

*The Trial Court Did Not Abuse Its*
*Discretion in Admitting the Gang Evidence*

Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

Appellant contends the trial court abused its discretion in admitting the gang evidence because other admissible evidence "failed to establish a nexus between the victim and any gang-related motive that was not essentially speculative. There was no evidence the victim belonged to or associated with a gang, or even that his outward appearance suggested he might be holding himself out as such. Nor was there evidence of any gang-related altercation or incident preceding the homicide that would typically give rise to a gang-motivated killing, such as a gang challenge, exchange of signs or competition over territory.

6

Instead, the People offered only the weak and speculative possibility that the fatal shooting might have been a case of 'mistaken identity' and involved gang activity because alleged gang members committed it in the territory of one of their rivals. For these reasons, the gang evidence either was completely irrelevant or any minimal probative value it arguably might have had was substantially outweighed by its well-recognized prejudicial effect."

" ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

The trial court did not abuse its discretion. Our Supreme Court has " 'described the "prejudice" referred to in Evidence Code section 352 as characterizing evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. . . .' " (*People v. Scheid* (1997) 16 Cal.4th 1, 19.) The gang evidence had substantial probative value as to appellant's motive and intent. Appellant was not the actual shooter. The actual shooter was J.T. Appellant could be convicted of murder only if he had aided and abetted J.T.'s shooting of Loadholt. The jury was instructed, "Someone *aids and abets* a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." Appellant observes, "The central issue here was appellant's intent to kill;

specifically, whether he shared and aided the shooter's specific intent to kill."

In his reply brief appellant acknowledges that "evidence of his mens rea at the time of the shooting was weak without the gang evidence." Appellant argues that, without this evidence, instead of "the driver and shooter . . . acting together, . . . the driver could just as likely have been driving as he did only because the passenger wanted to catch up to the vehicle for a reason unbeknownst to the driver . . . ." Appellant's positioning of the BMW next to the parked Mercedes "is equally consistent with how a driver would position a vehicle to accommodate a passenger who had said he wanted to interact with the driver of the parked car for any number of peaceable or non-violent purposes. . . . For all the BMW's driver might know, the passenger who asked him to catch up to and approach the other car might have wanted to greet a friend, verbally confront someone he had previously argued with, collect a debt, or invite to a party. Mere positioning of the two cars does not support an inference beyond a reasonable doubt [that] the driver of the BMW, appellant, knew what his passenger, [J.T.], intended to do once the windows were aligned."

The gang evidence refutes the theory that appellant was ignorant of J.T.'s unlawful purpose. It is reasonable to infer that appellant and J.T. misidentified the driver of the Mercedes as an Eight Trey gang member. A gang expert testified that "mistake[s] [i]n identity shootings" by gang members are "pretty common."

It is also reasonable to infer that appellant and J.T. planned to shoot the driver of the Mercedes regardless of whether he was a gang member. The gang expert opined that, if the

8

driver was not a member of Eight Trey, shooting him in Eight Trey's territory would still "be significant in the world of gangs." The expert explained that "[f]or the Rollin' 90's it's just [as] big [a] disrespect you can do for Eight Trey Gangsters" because a gang does not allow rival gangs to commit crimes inside its territory. "[E]ven though [the victim] may not be a gang member they [Eight Trey] still feel disrespected because it happened in their territory." "[I]t's a sign of disrespect" for Rollin' 90's gang members to even enter Eight Trey's territory. Committing a murder in Eight Trey's territory would enhance appellant's and J.T.'s reputation within the Rollin' 90's.

The trial court instructed the jury: "Having a motive may be a factor tending to show the defendant is guilty. Not having a motive may be a factor tending to show not guilty." "Gang evidence was critical to explaining, not appellant['s] general disposition to kill, but the specific motives for killing [Loadholt]." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1169.) "[B]ecause gang evidence was central to this case involving gang members committing [a] gang murder[] for gang motives, broad admissibility of gang evidence was appropriate." (*Ibid*.; see also *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551 [the gang "evidence, coupled with the evidence that appellant was a gang member, may have led the jury to the ineluctable conclusion that appellant intended to kill [Loadholt], but that does not render it inadmissible. [Citation.] To the contrary, the [gang] expert['s] testimony was crucial to the prosecution's theory of the case. [¶] The law does not disfavor the admission of expert testimony that makes comprehensible and logical that which is otherwise inexplicable and incredible"].)

Since the trial court did not abuse its discretion in admitting the gang evidence, we reject appellant's claim the admission "infringed on [his] federal constitutional right[] by rendering the trial fundamentally unfair." (Capitalization and bold omitted.) (See *People v. Partida* (2005) 37 Cal.4th 428, 439.)

*The Alleged Juror Misconduct*

Appellant contends, "The trial court erred by denying [his] motion for new trial on grounds that juror misconduct denied him his 'right to have the charges against him determined by a fair and impartial jury . . . .' " The alleged misconduct was based on two posts on social media by juror no. 21. On September 12, 2022, when jury selection began, she posted a photograph of herself wearing a juror badge. In response, a person posted, "You always get picked lock 'em up." Juror no. 21 did not respond to the post. On September 29, 2022, when jury deliberations began, she posted a photograph of herself accompanied by the statement, "I'm so tired of jury duty!!!!"

The prosecutor argued that "the juror committed no misconduct, and even if she did, no prejudice resulted." The court concluded the juror had committed misconduct because she "post[ed] [on social media] after the court told her not to [post]."

The court denied the motion for new trial because the misconduct was "very minimal" and not prejudicial. The court explained: "There's no indication that any other juror . . . was aware of the post . . . . There's no mention in the post of the evidence in the case, any opinions about the evidence, any of the parties, attorneys or witnesses. There's no mention in the post about deliberations or anything along those lines. Plus most importantly there was clearly more than sufficient evidence to support the verdict. The jury . . . acquitted the co-defendant

10

[Alon Hunt] which suggests that there was no predisposition on the part of this particular juror to convict whoever was on trial just because they were on trial."

"Jury misconduct ' "creates a presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred." ' [Citations.] The presumption can be rebutted 'by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm resulting from the misconduct.' [Citation.] This analysis has also been phrased as: 'The presumption is rebutted "if the entire record . . . indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." ' " (*People v. Flores* (2021) 70 Cal.App.5th 100, 112 (*Flores*).)

" ' "On appeal, . . . whether jury misconduct was prejudicial presents a mixed question of law and fact ' "subject to an appellate court's independent determination." ' [Citation.] We accept the trial court's factual findings and credibility determinations if supported by substantial evidence." ' " (*Flores*, *supra*, 70 Cal.App.5th at p. 113.)

We need not determine whether the juror's social media posts constituted misconduct. Assuming that they did, "the presumption of prejudice was thoroughly rebutted for the reasons discussed [by the trial court]. There is no substantial likelihood that any juror was impermissibly influenced to [appellant's] detriment." (*People v. Cooper* (1991) 53 Cal.3d 771, 838.) The posts on social media "had no bearing on the matter pending before the jury, that is, [appellant's] guilt or innocence." (*People v. Avila* (2006) 38 Cal.4th 491, 605 (*Avila*).)

11

Appellant contends the trial court's "misplaced focus on the strength of the evidence caused it to erroneously find the misconduct harmless." (Bold and capitalization omitted.) Appellant is referring to the court's statement, "[M]ost importantly there was clearly more than sufficient evidence to support the verdict." ~ **(RT 6623, lines 22-24)**~ (See *People v. Vigil* (2011) 191 Cal.App.4th 1474, 1488, fn. 5 ["Where the jury has been exposed to improper outside influences, the test for prejudice is not the strength of the prosecution's case, but whether the impartiality of the jury has been compromised"].) The "test" applied here by the trial court was "not the strength of the prosecution's case." This was one factor among several considered by the court. The other factors alone establish that the alleged misconduct was not prejudicial.

Appellant claims the trial court "erred by placing the burden of demonstrating prejudice on the defense" instead of requiring the People to rebut the presumption of prejudice. (See *People v. Weatherton* (2014) 59 Cal.4th 589, 600 ["It is for the *prosecutor* to rebut the presumption" of prejudice arising from juror misconduct].) In support of his claim, appellant cites page 6617 of volume 23 of the reporter's transcript. At this page the trial court asked defense counsel, "Let me hear from you as to why you believe this [misconduct] is prejudicial." We do not interpret the court's remark as imposing upon appellant the burden of demonstrating that the misconduct was prejudicial. The court was asking counsel to explain why the People had not carried their burden of rebutting the presumption of prejudice. "[W]e apply the general rule 'that a trial court is presumed to have been aware of and followed the applicable law.'" (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) Moreover, the trial court's

12

purportedly misplaced burden of proof has not affected our de novo decision that the prosecutor carried his burden of rebutting the presumption of prejudice. Therefore, any error as to the trial court's allocation of the burden of proof was harmless beyond a reasonable doubt.

### *The Trial Court Did Not Err in Denying Appellant's Request to Order Juror No. 21 to Appear in Court for Questioning*

Appellant asserts that the trial court "erred and violated [his] federal constitutional right to due process" by denying his request to order juror no. 21 into court so she could be questioned about her alleged misconduct. (Bold and capitalization omitted.) "The trial court has the discretion to conduct an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. [Citation.] Defendant is not, however, entitled to an evidentiary hearing as a matter of right. Such a hearing should be held only when the court concludes an evidentiary hearing is 'necessary to resolve material, disputed issues of fact.' [Citation.] 'The hearing should not be used as a "fishing expedition" to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. . . .' [¶] 'We review for abuse of discretion the trial court's denial of defendant's postverdict request for an evidentiary hearing into allegations of jury misconduct.'" (*Avila, supra*, 38 Cal.4th at p. 604.)

As we have previously explained, juror no. 21's posts on social media "did not create a strong possibility of prejudicial misconduct . . . ." (*Avila, supra*, 38 Cal.4th p. 605.) But appellant contends that, irrespective of the posts on social media, the trial

13

court abused its discretion because defense counsel argued that juror no. 21 had "published a picture of herself . . . flashing what appeared to be a gang sign." Defense "counsel believed the gang expert had described this type of gesture as a sign used by Rollin' 90's gang members."[5]

Appellant claims juror no. 21's "failure to disclose any familiarity with gang culture during voir dire even though she arguably appears to be flashing a gang sign in a group photograph suggests her impartiality may have . . . been compromised . . . ." But appellant observes that defense counsel "acknowledged the sign [juror no. 21] was flashing is 'subject to many different interpretations' and maybe was a 'peace sign' . . . ." Appellant asserts, "The very uncertainty about whether or not she was making a gang sign was 'why it needs to be investigated' by the court questioning the juror, either in court or even in camera."

We have inspected the photo at issue. It is dated "Feb 12" without indicating the year. The trial occurred in September 2022. The photo shows juror no. 21 in the company of three other women at "Taste of Inglewood." All the women are smiling. With her left hand, juror no. 21 is making a "V" sign by parting her index and middle fingers. Based on this flimsy evidence, we

---

[5] Appellant acknowledges that "[e]rrors in the reporter's transcript make the expert's description of the hand sign *somewhat* difficult to decipher." (Italics added.) "Somewhat" is an understatement. Appellant notes, "The pertinent part of the transcript [of the expert's testimony] reads: '. . . you would put you're not ping evan you're not ring finger down curled in bring other fingers upsidedown and thumb extended incident finger extended middle finger extended.' (14 RT 3987.)"

cannot speculate that juror no. 21 may have been "flashing a gang sign." The prosecutor objected that "most people" would interpret the sign as a "peace sign." (See <https://stock. adobe.com/search?k=peace+sign+hand> [as of Mar. 6, 2026], archived at <https://perma.cc/3C4A-8F4B>.

Thus, the trial court did not err in denying appellant's request for an evidentiary hearing at which juror no. 21 would be compelled to testify. (See *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1092 ["The uncontrolled invasion of juror privacy following completion of service on a jury is . . . a substantial threat to the administration of justice"].)

*Correction of Abstract of Judgment*

The first page of the abstract of judgment shows that appellant was "convicted by" a "plea." Since appellant was convicted by a jury, the parties agree that the abstract of judgment should be corrected.

There is another error in the abstract of judgment that neither party mentions. Section 6.c. shows that on count 1 (first degree murder) appellant was sentenced to prison for 25 years to life. It should show that he was sentenced to 75 years to life because the 25 year-to-life sentence was tripled pursuant to the Three Strikes law.

*Disposition*

The judgment is affirmed. The trial court is directed to correct the first page of the abstract of judgment to show that appellant was convicted by a jury, not by plea, and was sentenced to prison for 75 years to life on count 1 (first degree murder), not 25 years to life. The trial court is further directed to transmit a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

15

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:


BALTODANO, J.


CODY, J.

David Herriford, Judge

Superior Court County of Los Angeles

_____

Law Offices of Steven Schorr and Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.